IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA & STATE OF NEW HAMPSHIRE DEPARTMENT OF ENVIRONMENTAL SERVICES, | ) ) ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) | Civil No. 1:22-cv-289-SM-AJ |
| MCCORD CORP., | ) ) |  |
| Defendant. | ) ) |  |

_____

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

## Table of Contents

**INTRODUCTION**................................................................................................................1

**STATUTORY BACKGROUND AND SUPPORTING EVIDENCE**................................3

**MATERIAL UNDISPUTED FACTS**........................................................................5

*General Description and History of the Site* ................................................................5

*Corporate History*.............................................................................................................6

*Operations at the Farmington Plant* ..............................................................................8

    *1971 – 1977: The McCord Maine Years* ......................................................................8

    *1978 – 1986: The Ex-Cell-O Years* ...........................................................................17

    *1986 – 1990: Insurance Litigation in the Eastern District of Michigan*...................21

    *1986 – 2009: Restructuring and the Collins & Aikman Bankruptcy* ......................22

    *2009 – Present: State and Federal Remediation Begins* ..........................................22

**STANDARD OF REVIEW** .......................................................................................23

**ARGUMENT** ..............................................................................................................24

  **I.**   **Defendant Is the Successor to McCord Maine and Ex-Cell-O, Persons Under CERCLA.**.....25

  **II.**  **Under *Bestfoods*, Defendant Operated the Farmington Plant.**................................26

  *A.*   *Bestfoods and Its Progeny*.....................................................................................27

  *B.*   *Defendant Operated the Farmington Plant via Its Employees.* ...........................29

    *1. Birch Managed Efforts to Control Wastewater at the Farmington Plant.*.......30

    *2. Birch, Filipiak, and Vashak Managed Environmental Compliance Efforts at the Farmington Plant.*..............................................................................................33

    *3. Birch Managed Expansion of the Farmington Plant Septic System.* ...............35

    *4. Birch's Involvement at the Plant Violated Corporate Norms.*...........................36

  *C.*   *Ex-Cell-O Violated Corporate Norms.* ...............................................................39

  **III.** **Defendant Treated Davidson Rubber as a Division and Thus Operated the Farmington Plant.**................................................................................................42

  **IV.** **Defendant's Liability Was Not Discharged by Collins & Aikman's Bankruptcy.**.................46

**CONCLUSION** .........................................................................................................48

## INTRODUCTION

In the early 1970s, water pollution from an automobile part manufacturing plant in Farmington, New Hampshire (Farmington Plant or Plant) was a known problem, as dirty, grey, milky, and malodorous water streamed from the Plant during operations. By 1983, sampling of groundwater beneath the Plant and in nearby water bodies revealed the presence of volatile organic compounds. In 1990, following insurance litigation for pollution coverage, the District Court for the Eastern District of Michigan ruled that "[t]he design and operation of the Farmington Plant facilitated disposal of hazardous liquid waste directly into the environment." *Fireman's Fund Ins. Cos. v. Ex-Cell-O Corp.*, 750 F. Supp. 1340, 1351 (E.D. Mich. 1990).

Today, the main Plant building has been closed and razed. While concrete slab foundations mark most of what visibly remains of the Plant, which is now known as the Collins and Aikman Plant (Former) Superfund Site, pollution persists in the groundwater. Under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*, a corporation that manages, directs, or conducts operations related to pollution or environmental compliance is jointly and severally liable for the costs of remediating that pollution. *See United States v. Bestfoods*, 524 U.S. 51, 66–67 (1998). Successor corporations inherit that liability. *See John S. Boyd Co., Inc. v. Boston Gas Co.*, 992 F.2d 401, 404–05 (1st Cir. 1993).

Response costs under CERCLA are recoverable against: (1) any person; (2) who owned or operated; (3) a facility; (4) from which hazardous substances were released; if (5) those costs are not inconsistent with the National Contingency Plan (NCP). 42 U.S.C. § 9607(a)(2), (a)(4)(A). Under New Hampshire law, response costs are recoverable under nearly the same circumstances, except that the costs do not need to be consistent with the NCP. N.H. RSA 147-

1

B:10. In this case, Defendant has stipulated or admitted to the following: (1) under CERCLA and New Hampshire law, Defendant is a person; (2) under CERCLA and New Hampshire law, the Farmington Plant is a facility; (3) hazardous substances were released from the Farmington Plant between 1966 and 1986; (4) Plaintiffs have incurred at least some costs not inconsistent with the NCP; (5) Defendant is the successor to McCord Corporation (incorporated in Maine); and (6) Defendant is the successor to Ex-Cell-O Corporation.[1] Therefore, the only remaining issue for the Court to determine liability is to decide whether McCord Corporation (Maine) and/or Ex-Cell-O Corporation operated the Farmington Plant, which would make Defendant liable as their successor.

The evidence, developed from the extensive factual findings of the *Fireman's Fund* court, as well as Plaintiffs' expert on corporate norms, demonstrates that Defendant[2] made decisions as suited it but failed to respect corporate norms and triggered liability under CERCLA and New Hampshire law. First, Defendant's Manager of Safety and Ecology, Richard Birch, managed and made decisions about pollution and environmental compliance at the Plant when the Plant's owner, Davidson Rubber Company, did not have an employee in that role at that time. Second, Defendant treated Davidson Rubber Company, as an internal division, rather than a separate subsidiary, and held it out as such to the public and regulators. Unlike a subsidiary, a division of a corporation is not a separate legal entity, but part of the corporation itself. *Kleen*

---

[1]     Amended Joint Stip., June 28, 2023, ECF No. 33 ¶¶ 4–7; Ex. 2, McCord Response to Requests for Admission Nos. 4–8, 15–19; *see also Fireman's Fund Ins. Cos.*, 750 F. Supp. at 1351 ("The design and operation of the Farmington plant facilitated disposal of hazardous liquid waste directly into the environment.").

        In support of this motion, Plaintiffs submit copies of Defendants' discovery responses and productions identified in Ex. 1, Spohn Decl., ¶¶ 3–4.

[2]     Because Defendant admits that it is the successor to both McCord Corp. (Maine) and Ex-Cell-O Corp., "Defendant" refers to McCord Michigan and its corporate predecessors.

*Laundry & Dry Cleaning Servs., Inc. v. Total Waste Mgmt. Inc.*, 867 F. Supp. 1136, 1143

(D.N.H. 1994). Defendant should not now be permitted to shield itself from liability for the

pollution released from the Plant. Under either theory, this Court should find Defendant liable for

the Plaintiffs' past and future costs incurred in response to the pollution at the Site so that the

taxpayers do not shoulder these costs.

## STATUTORY BACKGROUND AND SUPPORTING EVIDENCE

Congress enacted CERCLA in 1980 to provide a comprehensive mechanism for

remediating hazardous substances and funding such remediation and related enforcement

activities, which are known as "response actions." 42 U.S.C. §§ 9604(a), 9601(25). Section

107(a)(2) of CERCLA, 42 U.S.C. § 9607(a), provides in pertinent part:

> [S]ubject only to the defenses set forth in subsection (b) of this Section . . . (2) any
> person who at the time of disposal of any hazardous substance owned or operated
> any facility at which such hazardous substances were disposed of, . . . (4) shall be
> liable for (A) all costs of removal or remedial action incurred by the United States
> Government or a State. . . not inconsistent with the [NCP] . . . .

An "owner or operator" of a facility is "any person owning or operating such facility." *Id.*

§ 9601(20)(A)(ii). The United States Supreme Court held that to establish direct liability under

CERCLA, "an operator must manage, direct, or conduct operations specifically related to

pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or

decisions about compliance with environmental regulations." *Bestfoods*, 524 U.S. at 52. The

Court recognized circumstances where a parent company can be directly liable as an operator

under CERCLA, including when "an agent of the parent with no hat to wear but the parent's hat

might manage or direct activities at the facility," or when the parent's actions depart from the

norms of oversight at the facility. *Id.* at 71.

3

Plaintiff, New Hampshire Department of Environmental Services (NHDES), also brings this action, in addition to CERCLA, pursuant to New Hampshire RSA 147-B, which makes up the State analog to CERCLA. The relevant provisions of N.H. RSA 147-B:10 read almost verbatim to CERCLA. The state statute provides, in part:

> Subject only to the defenses set forth in RSA 147-B:10-a and the exclusions and limitations set forth in RSA 147-B:10, IV and V, any person who:…(2) [o]wned or operated a facility at the time hazardous waste or hazardous materials were disposed there…shall be strictly liable for all costs incurred by the state in responding to a release or threatened release of hazardous waste or hazardous materials at or from the facility as specified in paragraph II.

RSA 147-B:10, I. Given the similar text and purposes of CERCLA and the New Hampshire statute, this Court should apply *Bestfoods* to assess operator liability under New Hampshire law. *See EnergyNorth Nat. Gas, Inc., v. UGI Util., Inc.*, No. Civ. 00-500-B, 2003 WL 1700494, at *2 (D.N.H. Mar. 28, 2003) (recognizing similarities between CERCLA and New Hampshire law).

In support of these arguments, Plaintiffs rely on deposition transcripts[3] from the *Fireman's Fund* litigation described further below, other available historical documents, and the expert opinion of Dan Leistra-Jones on corporate norms. Exs. 5 & 6, Leistra-Jones Reports. Richard Birch, Howard Williams, and other Davidson Rubber employees were deposed between 1986 and 1990, closer in time to the events at issue. During the *Fireman's Fund* litigation, Howard Williams, the Policyholders' 30(b)(6) representative, and Richard Birch were deposed six and seven times, respectively. The Parties to this action did not depose new fact witnesses or redepose witnesses who were previously deposed in the *Fireman's Fund* litigation.

---

[3]    Some of these transcripts were subject to a protective order that was subsequently dissolved following the conclusion of the *Fireman's Fund* litigation. *See* Ex. 3, Order Dissolving a Protective Order Dated and Entered Feb. 25, 1988, Fireman's Fund Ins. Cos. v. Ex-Cell-O Corp., No. 2:85-cv-71371-JF-SDP (E.D. Mich. May 20, 1994), ECF No. 1044.

## MATERIAL UNDISPUTED FACTS

### *General Description and History of the Site*

The Collins & Aikman Plant (Former) Superfund Site in Farmington, New Hampshire (the Site)[4] includes two parcels located south of New Hampshire Route 11: (i) a 96-acre parcel located on Davidson Drive; and (ii) a 10-acre parcel located at 56 Davidson Drive. The Site includes the former automobile part manufacturing plant, referred to as the Farmington Plant or the Plant.[5] The Site also extends into and includes an approximately 152-acre area north of Route 11 affected by the Site-related contamination, including a groundwater plume, which the United States Environmental Protection Agency (EPA) has identified as the Northern Downgradient Area.[6] This Area is roughly bounded by NH Route 11, Pokamoonshine Brook to the north/northwest, and the boundaries of several properties containing the plume to the east.[7]

As described in more detail below, manufacturing at the Farmington Plant resulted in groundwater contaminated with volatile organic compounds (VOCs). *Fireman's Fund Ins. Cos.*, 750 F. Supp. at 1345. Manufacturing included urethane foam molding, washing, and painting of polyvinyl chloride (PVC) shells. *Id*. Solvents, including acetone, isopropyl alcohol, methylene chloride, methyl isobutyl ketone, methyl ethyl ketone, tetrachloroethene (also called perchlorethylene, or PCE), toluene, trichloroethene (TCE), and xylene, were also used. *Id*. Waste generated during Plant operations included the following:

---

4     Ex. 8, Hull Decl., ¶ 4.

5     *Id.*

6     *Id.*

7     *Id.*

> [S]ludge from a vapor degreasing process that uses [PCE] to remove oil from metal structural inserts; waste plastisol[8] generated from shell manufacture; paint waste, including toluene, xylene, and methyl ethyl ketone ("MEK"), generated by cleaning paint guns and ventilation booths; soapy liquid and solid waste from washing completed parts; methylene chloride used to flush urethane foam-making nozzles; semi-solid sludge ("still bottoms")[9] from distilling foam and methylene chloride to reclaim methylene chloride; shellsol-soaked rags used to wipe off vinyl shells; and vinyl and urethane scraps.

*Id.* Wastewater at the Farmington Plant was discharged directly into the environment over the years. *Id.* at 1350–51. At first, it was discharged into a tributary of Pokamoonshine Brook, then onto the ground on the north side of the Plant, and later through lagoons that were constructed to accept wastewater. *Id.* These discharges resulted in groundwater contamination at the Farmington Plant. *Id.*

### *Corporate History*

Defendant is headquartered in Troy, Michigan. Answer ¶¶ 8–9, ECF No. 21. This entity is referred to as "McCord Michigan" or "Defendant." In 1964, McCord Corporation, incorporated under Maine law (McCord Maine), entered into a Plan and Agreement of Reorganization with Davidson Rubber Company, Inc. (Davidson Rubber), a New Hampshire corporation, whereby McCord Maine purchased substantially all the assets and assumed

---

[8]    Plastisol is a liquid suspension of PVC used to manufacture automobile dashboard shells at the Farmington Plant. *See* Ex. 9, Greenlaw Depo. p. 40:16–17, EPA-SEMS_0046746 at 46786.

EPA Region 1 manages electronic records and copies of select digitized paper records for each of its cleanup sites in its Superfund Enterprise Management System (SEMS). Plaintiffs rely on EPA SEMS records for this Site in support of this motion. *See* Ex. 7, Gilleland Decl. ¶¶ 2–7.

[9]    A methylene chloride "still bottom" results from the production line containing foam and liquid methylene chloride. It is collected in a 55-gallon drum, which is reclaimed in a "still," and heated. The methylene chloride comes off its contents and collected, and the still bottom is what remains. Ex. 10, Williams Depo. Vol. I, p. 120, EPA-SEMS_0069176 at 69295.

substantially all the liabilities of Davidson Rubber.[10] Davidson Rubber was a subsidiary of

McCord Maine from 1964 to 1978.[11] In 1965, Davidson Rubber acquired approximately 81 acres

of land in Farmington to construct the Plant.[12] Operations began in 1966.[13]

In 1978, corporate reorganizations occurred that brought about the Defendant in this

action. On January 27, 1978, Ex-Cell-O Corporation (Ex-Cell-O), a Michigan corporation; XLO,

Inc., Ex-Cell-O's wholly owned Michigan subsidiary; and McCord Maine, entered into an

Agreement and Plan of Merger to acquire McCord Maine.[14] McCord Maine merged with and

into XLO, Inc., a Michigan corporation that was the surviving entity and the successor to

McCord Maine.[15] XLO, Inc. changed its name to McCord Corporation, domiciled in Michigan,[16]

the Defendant in this action. As a result, Ex-Cell-O was the direct parent and sole owner of

Defendant. Defendant, in turn, was the direct parent and sole owner of Davidson Rubber.[17]

In 1986, Textron, Inc. (Textron) acquired Ex-Cell-O and its portfolio, including Davidson

Rubber, in what Ex-Cell-O's Board of Directors described as a merger with Textron.[18] Ex-Cell-

O was liquidated through a series of transactions, including transferring all of Ex-Cell-O's shares

of Defendant into another entity, TX Financing Corp. 12.[19] At that time, Defendant owned all of

---

[10]    Ex. 2, McCord Responses to Requests for Admission Nos. 1–3. Davidson Rubber
Company was then reorganized under Delaware law. *E.g.*, Ex. 5, Leistra-Jones Report ¶ 17.

[11]    Ex. 5, Leistra-Jones Report, ⁋ 16.

[12]    Ex. 11, EPA-SEMS_0062394 at 62397; Ex. 5, Leistra-Jones Report, ⁋ 19.

[13]    Ex. 12, EPA-SEMS_0062410 at 62415.

[14]    Ex. 13, EPA-SEMS_0062082 at 62103–62104; Ex. 5, Leistra-Jones Report ¶¶ 20–22.

[15]    Ex. 2, McCord Response to Requests for Admission Nos. 4–8.

[16]    Ex. 14, McCord § 104(e) Response, EPA-SEMS_0044321 at 44421–23, 44427.

[17]    *Id.*, EPA-SEMS_0044321 at 0044323; Ex. 5, Leistra-Jones Report, ¶ 22.

[18]    Ex. 15, McCord0026836 at 26838.

[19]    Ex. 2, McCord Response to Requests for Admission No. 12.

the shares of Davidson Rubber.[20] Later, in 1991, TX Financing Corp. 12 merged into Defendant,

which was the surviving entity of that merger.[21] As a result, Defendant admits that it is the

successor to Ex-Cell-O.[22] Defendant, as it exists currently, is an indirect subsidiary of Textron.[23]

### Operations at the Farmington Plant

#### 1971 – 1977: The McCord Maine Years

By 1966, Davidson Rubber began manufacturing automobile parts at the Farmington

Plant, including automobile instrument panels, bumpers, fascias, and other parts. *Fireman's*

*Fund Ins. Cos.*, 750 F. Supp. at 1345. In 1964, Richard Birch was an Assistant Chief Engineer at

Davidson Rubber's facility in Dover, New Hampshire.[24] In 1967, he became an employee of

McCord Maine and moved to Detroit.[25] In 1971, Birch was promoted to McCord Maine's

Manager for Safety and Ecology, where his role included inspecting its plants and making

recommendations for compliance with the Occupational Health and Safety Act.[26] McCord

Maine's 1971 annual shareholder report described Birch's new role as follows:

> Mindful of its responsibilities to protect the natural environment and help improve
> the communities where it operates plants, McCord expanded its corporate
> citizenship role this year. An experienced McCord engineer was appointed to a
> newly created position of manager of safety and ecology. In addition to his safety
> responsibilities, he is working with divisions on ways to reduce or eliminate any
> air, water, or noise pollution that manufacturing plants may generate.[27]

---

[20]    *Id.*, McCord Response to Requests for Admission No. 13.

[21]    Ex. 2, McCord Response to Requests for Admission Nos. 17 & 18.

[22]    *Id.*, McCord Response to Requests for Admission No. 19.

[23]    Ex. 14, McCord § 104(e) Response, EPA-SEMS_0044321 at 0044331.

[24]    Ex. 16, Birch Depo. Vol. I, p. 4:19–23, EPA-SEMS_0044866 at 44870.

[25]    *Id.*, p. 5:3–5, EPA-SEMS_0044866 at 44871.

[26]    *Id.*, pp. 5, 30–31, EPA-SEMS_0044866 at 44871, 44896–97; Ex. 17, EPA-SEMS_0062502 at 62513.

[27]    Ex. 17, EPA-SEMS_0062502 at 62513.

Birch's title "gradually modified into Facilities Manager and Safety Director" until 1978.[28]

There is no evidence indicating that Davidson Rubber employed anyone at the Farmington Plant whose job responsibilities officially included expertise in pollution and environmental compliance comparable to Birch until at least 1976, when Howard Williams—based at another facility in Dover—was promoted to Davidson Rubber's Manager of Safety and Environmental Affairs.[29]

Effluent from operations at the Farmington Plant drained into a culvert[30] at the parking lot at the southern end of the Plant, which discharged into an unnamed tributary to a wetland that drains to Pokamoonshine Brook.[31] Early in the history of the Farmington Plant, noncontact cooling water was discharged into the Pokamoonshine Brook,[32] although discharge from wash and process lines from manufacturing processes drained through the culvert via floor drains inside the Plant.[33] Wastewater discharge volumes varied over time, but in July 1971, a contractor estimated that flow of effluent from the Farmington Plant averaged approximately 60,000 gallons of water per day.[34] As Birch later explained, because the Farmington Plant was not

---

[28]     Ex. 16, Birch Depo. Vol. I, p. 6:2–4, EPA-SEMS_0044866 at 44872.

[29]     Howard Williams' office was at the Dover facility, not at the Farmington Plant. Ex. 10, Williams Depo. Vol. I, pp. 12–13, 30, 40, EPA-SEMS_0069176 at 69187–88, 69205, 69215; Ex. 18, Williams Depo. Vol. II, pp. 16–17, EPA-SEMS_0069365 at 69380–81. In 1979, Howard Greenlaw was hired as group leader of utilities at the Farmington Plant, where his role included waste disposal. Ex. 9, Greenlaw Depo. Vol. I, pp. 19, 21, EPA-SEMS_0046746 at 46765, 67.

[30]     This culvert is identified as the South Storm Sewer on Figure 1. Ex. 8, Hull Decl., ¶ 7.

[31]     Ex. 19, Birch Depo. Vol. VI, pp. 902, 906–07, EPA-SEMS_0045362 at 45445, 45449–50; Ex. 20, EPA-SEMS_0002093 at 2105–06; *see also Fireman's Fund Ins. Cos.*, 750 F. Supp. at 1351 ("Initially, waste water was discharged into the Pokamoonshine Brook tributary . . . .").

[32]     Ex. 16, Birch Depo. Vol. I, pp. 89–91, EPA SEMS_0044866 at 44955–57.

[33]     Ex. 19, Birch Depo. Vol. VI, pp. 912–914, EPA-SEMS_0045362 at 45456–58; Ex. 10, Williams Depo. Vol. I at 44, EPA-SEMS_0069176 at 69219.

[34]     Ex. 21, EPA-SEMS_0047516 at 47791–93.

connected to a municipal sewer, wastewater was disposed of via a septic tank field or direct discharge onto the ground.[35]

By 1971, wastewater at the Farmington Plant was starting to attract Birch's attention in McCord Maine's Detroit office. Birch, who had been copied on the Farmington Plant's first discharge permit application,[36] sent a memo dated November 3, 1971, to Edward Veale, the then-manager of the Farmington Plant,[37] identifying several specific concerns about bacteria in the wastewater effluent of the Farmington Plant.[38] Birch concluded that poor housekeeping was the cause, and directed five different actions "should be done on [a] crash basis" to address the bacteria counts in the Plant's effluent, including: (1) relocating facility dumpsters and directing cafeteria waste to be piled in a dumpster; (2) cleaning out a drain line; (3) moving a trash compactor; (4) cleaning the area around the trash compactor more frequently; and (5) installing a hose bib and washing the area daily with hypochlorite.[39] Davidson Rubber staff implemented all but one action, which was determined to be infeasible.[40]

In December 1971, Birch visited the Farmington Plant and met with Davidson Rubber to discuss concerns about the Plant's water pollution.[41] As summarized in a December 10, 1971 memorandum, ongoing water quality concerns at the Plant could result in a "potential problem," and "from both a legal and community relations standpoint," a water treatment facility should be

---

[35]     Ex. 19, Birch Depo. Vol. VI, p. 910:12–17, EPA-SEMS_0045362 at 45454.

[36]     Ex. 22, EPA-SEMS_00045739.

[37]     Ex. 10, Williams Depo. Vol. I, pp. 26–27, EPA-SEMS_0069176 at 69201–02.

[38]     Ex. 23, EPA-SEMS_0045608.

[39]     *Id.*

[40]     Ex. 24, EPA-SEMS_0027414 at 27422–23.

[41]     Ex. 25, EPA-SEMS_0045733.

constructed.[42] Birch suggested that Farmington Plant staff investigate constructing a lagoon between the parking lot and Pokamoonshine Brook to retain and aerate effluent from the Plant before discharging into the Brook.[43] According to the summary, everyone agreed with this approach and consulted with an environmental engineer to discuss implementation.[44]

After the environmental engineer developed a proposal for a water re-use reservoir,[45] Birch reviewed the proposal and stated it would be "adequate as long as some provision is made to trap surface oils for periodic manual removal."[46] Birch claimed it was important to eliminate "visible oil films" and stated that this change "could be worked in at minimum expense."[47]

In July 1973, Birch issued a memorandum on McCord Maine intra-company letterhead to McCord Maine's facilities, including the Farmington Plant, about the nascent Federal Water Pollution Control Act of 1972 (Clean Water Act), stating that "[e]ach individual plant should start an aggressive water conservation program."[48] He also stated that he would visit each facility to collect effluent samples for analysis to "enable us" to determine pollution control requirements and costs.[49] Birch later became involved in efforts at the Farmington Plant to

---

[42]    Ex. 26, EPA-SEMS_0045734; Ex. 19, Birch Depo Vol. VI at pp. 901:17–903:7, EPA-SEMS_0045362 at 45444–46; *see also Fireman's Fund Ins. Cos.*, 750 F. Supp. at 1351–52.

[43]    Ex. 26, EPA-SEMS_0045734; Ex. 19, Birch Depo Vol. VI at pp. 901–03, EPA-SEMS_0045362 at 45444–46.

[44]    Ex. 27, EPA-SEMS_0027669; Ex. 24, EPA-SEMS_0027414 at 27414–15.

[45]    *See* Ex. 28, EPA-SEMS_0045694.

[46]    Ex. 27, EPA-SEMS_0027669 at 27670. Davidson Rubber copied Birch on subsequent correspondence confirming that his proposed provisions to remove gasoline and oil runoff could be made. Ex. 29, EPA-SEMS_0045742.

[47]    Ex. 27, EPA-SEMS_0027669 at 27670.

[48]    Ex. 30, EPA-SEMS_0027730 at 27731. The first page of this memo is dated July 27, 1972, but the second page is dated 1973. Because the Clean Water Act was not enacted until October 1972, Plaintiffs presume this memo was dated July 1973. *See* EPA-SEMS_0027730.

[49]    *Id.* at 27732 ¶ 4.

11

obtain a Clean Water Act discharge permit, personally calling an EPA official to request less stringent sampling requirements under the Plant's draft permit,[50] and he was copied on related monthly monitoring reports that were sent to EPA in 1974 and 1975.[51]

Meanwhile, Farmington Plant workers began to seek additional solutions to its ongoing water pollution problem. An April 24, 1973 memo from Davidson Rubber identified five processes that discharged through the drain pipe at the rear of the Farmington Plant, eventually into Pokamoonshine Brook, containing chemical contamination.[52] This discharge was called "serious pollution" and "illegal."[53] Davidson Rubber proposed temporarily rerouting the drainage system to the front roof drainage system (the North Storm Sewer) on the northern end of the Plant and submitted an appropriations request to McCord Maine for this proposal.[54] By July 1973, an environmental consultant identified additional concerns: an average of 14,000 gallons of water per day now discharged to the north end of the facility that "threaten[ed to] spread[] onto adjacent privately owned land," and was "dirty grey in color and contain[ed] substantial quantities of paint solids and foam grindings."[55] Davidson Rubber described water discharged at the north end of the Farmington Plant as "unsightly, malodorous, and … an

---

[50]    Ex. 31, EPA-SEMS_0027738 (noting a telephone conversation between an EPA sanitary engineer and "Mr. Richard Birch of your Detroit, Michigan corporate office").

[51]    Ex. 32, EPA-SEMS_0002016; Ex. 33, EPA-SEMS_0027872; Ex. 34, EPA-SEMS_0002012; Ex. 35, EPA-SEMS_0027968; Ex. 36, EPA-SEMS_0027969; Ex. 37, EPA-SEMS_0027971; Ex. 38, EPA-SEMS_0027979.

[52]    Ex. 31, EPA-SEMS_0027738 at 27747; *Fireman's Fund Ins. Cos.*, 750 F. Supp. at 1352.

[53]    *See* Ex. 39, EPA-SEMS_0027864 at 27865–66 ¶¶ 9–10.

[54]    Ex. 31, EPA-SEMS_0027738 at 27743–46; *Fireman's Fund Ins. Cos.*, 750 F. Supp. at 1352. The appropriations request identified Davidson Rubber as a "division." *See* EPA-SEMS-_0027738 at 27744.

[55]    Ex. 31, EPA-SEMS_0027738 at 27753; *Fireman's Fund Ins. Cos.*, 750 F. Supp. at 1352.

'attractive nuisance,'" and "could result in extremely adverse community reactions."[56]

In July 1973, the environmental consultant proposed to treat effluent from the Farmington Plant for at least $50,000.[57] In August, Davidson Rubber prepared an appropriations request, on letterhead identifying Davidson Rubber as a "Division of McCord [Maine]," for $12,000 for a revised engineering study and design of a treatment facility.[58] Despite being approved by two Davidson Rubber "Division" officials as of at least November 1973, as well as by someone with McCord's "Corporate Operating" authority,[59] the August 1973 appropriations request for $12,000 was later deferred, due to the energy crisis that year.[60]

With the deferral of the August 1973 appropriations request, water pollution at the Farmington Plant continued. In April 1974, Birch inspected the Plant and its continued water pollution discharge from the North Storm Sewer outfall.[61] By then, water consumption at the Plant ranged from 75,000-150,000 gallons per day, and Birch anticipated that water use would increase by an additional 25,000 gallons per day due to a new process line.[62] In an April 17, 1974 memo, entitled "Farmington Water Problem" and labeled "McCord Intra-Company Correspondence," Birch wrote:

---

[56]    Ex. 39, EPA-SEMS_0027864 at 27866 ¶ 7.

[57]    Ex. 31, EPA-SEMS_0027738 at 27754; *Fireman's Fund Ins. Cos.*, 750 F. Supp. at 1352.

[58]    Ex. 31, EPA-SEMS_0027738 at 27749; *Fireman's Fund Ins. Cos.*, 750 F. Supp. at 1352. The appropriations request form had three signatures, including one for "Division Financial," "Division Administrative," and "Corporate Operating." EPA-SEMS_0027738 at 27750.

[59]    Ex. 31, EPA-SEMS_27738 at 27750.

[60]    Ex. 39, EPA-SEMS_0027864 at 27867–68 ¶ 12; *Fireman's Fund Ins. Cos.*, 750 F. Supp. at 1352.

[61]    Ex. 40, EPA-SEMS_0027756.

[62]    *Id.*, ¶¶ 2–3.

The drains from all c/p [crash pad][63] wash lines are piped into the building roof leaders which discharge on the surface at the north end of the plant beside the railroad siding. This water is impounded briefly, where suspended PVA[64] agglomerates and floats to the surface, creating a foul waste with very poor visual characteristics, being milky in appearance and leaving any grass and shrubbery in its path blackened and dead.

…

The community problems that would be raised by general knowledge of such a waste stream and the concomitant poor publicity resulting certainly behoove us to take immediate action to control this condition.

We are and have been in violation of the law by not applying for an EPA Discharge Permit for this waste.[65]

Birch also told the Plant staff to: (1) begin an "aggressive water conservation program . . . at once"; (2) install a wooden PVA skimmer in the Plant's temporary discharge impoundment; and (3) seek an appropriations request for water conservation studies and "evaluations of possible treatment schemes."[66] Birch stated that he would "see that [the appropriations request] does not get hung up in Detroit," referring to McCord Maine's headquarters.[67]

In May 1974, Davidson Rubber submitted a new appropriations request to McCord Maine to "alleviate the waste water problems at the Farmington Plant," which faced additional water consumption concerns driven by a new wash process line.[68] Davidson Rubber staff stated the project was "mandatory this year, since we are now overflowing onto neighboring property,

---

[63]    *See* Ex. 19, Birch Depo. Vol. VI, p. 923:22–24, EPA-SEMS_0045362 at 45467.

[64]    Polyvinyl alcohol, also known as PVA, was used at the Farmington Plant. *See id.*, p. 919:12–18, EPA-SEMS_0045362 at 45463.

[65]    Ex. 41, EPA-SEMS_0027774 at 27785–87; Ex. 19, Birch Depo. Vol. VI, at p. 922:16–23, EPA-SEMS_0045362 at 45466; *Fireman's Fund Ins. Cos.*, 750 F. Supp. at 1352.

[66]    Ex. 41, EPA-SEMS_0027774 at 27786–87.

[67]    *Id.* at 27787.

[68]    *Id.* at 27775; *Fireman's Fund Ins. Cos.*, 750 F. Supp. at 1352–53. The memo proposing the appropriations request was on letterhead identifying Davidson Rubber as "a Division of McCord [Maine]." EPA-SEMS_0027774 at 27775.

exposing the company to civil action, and adverse publicity in a New Hampshire election year," echoing Birch's April 17, 1974 memo to Davidson Rubber.[69] Birch's April 17, 1974 memo was followed with an appropriations request, noting that Birch reviewed the proposal and supported it.[70] Birch was later copied on a wastewater treatment study schedule to implement his proposed course of action to address the wastewater discharge problem.[71]

On July 26, 1974, Davidson Rubber's environmental consultant finalized a Preliminary Engineering Report, summarizing its analysis of alternatives for addressing the wastewater.[72] That report evaluated several alternatives, including a lagoon system to percolate contaminated wastewater into the ground. It stated that the lagoons were the most cost-effective option but could cause groundwater contamination.[73]

On August 14, 1974, a Plant manager prepared an appropriations request and accompanying memorandum to build the lagoon system,[74] which the New Hampshire Water Supply and Pollution Control Commission (Commission) had to approve before construction could begin.[75] After the Commission approved the use of lagoons to treat the wastewater at the Farmington Plant,[76] Plant staff copied Birch.[77] By 1975, the lagoon system was built, and

---

[69]   Ex. 41, EPA-SEMS_0027774 at 27775, 27785–6; *Fireman's Fund Ins. Cos.*, 750 F. Supp. at 1353.

[70]   Ex. 41, EPA-SEMS_0027774 at 27775.

[71]   Ex. 42, EPA-SEMS_0027871.

[72]   Ex. 43, EPA-SEMS_0027880.

[73]   *Id.* at 27886; Ex. 44, EPA-SEMS_0027953.

[74]   Ex. 44, EPA-SEMS_0027953.

[75]   Ex. 43, EPA-SEMS_0027880 at 27885.

[76]   Ex. 45, EPA-SEMS_0027957.

[77]   Ex. 46, EPA-SEMS_0043806 at 44121–22.

effluent from the North Storm Sewer outlet,[78] as well as liquid wastes via floor drains in the

Plant,[79] was re-routed to it.

Lagoon construction was followed by additional Plant expansion in the late 1970s. Birch

directly managed the expansion of the main building,[80] including the construction of a sewage

waste disposal system with a leach field. He testified that he was the "principal owner's

representative in connection with [both] the construction of the original building at Farmington

and the addition" later in the 1970s, which put him at the Plant almost daily.[81] On July 15, 1977,

the environmental consultant sought Birch's approval of the plan before submitting it to the

Commission.[82] The consultant also copied Birch on a preliminary cost estimate for the septic

system.[83] Birch testified that floor and sink drains from the Farmington Plant were designed to

connect to this septic system.[84] A later remedial investigation noted that several floor drains near

industrial processes drained to the septic system.[85] That investigation "speculated that floor

---

[78]    Ex. 20, EPA-SEMS_0002093 at 2104.

[79]    Ex. 47, Littlefield Depo. pp.74–75, EPA-SEMS_0047960 at 48032–33.

[80]    Ex. 16, Birch Depo. Vol. I, pp. 61:3–11, 20–24, 62:16–22, 63:8–10, EPA-SEMS_0044866 at 44927–29.

[81]    *Id.*, p. 77:17–22, EPA-SEMS_0044866 at 44943.

[82]    Ex. 48, EPA-SEMS_0028053; Ex. 49, EPA-SEMS_0028054; Ex. 50, EPA-SEMS_0028056.

[83]    Ex. 51, EPA-SEMS_0028066.

[84]    Ex. 16, Birch Depo. Vol. I, p. 79, EPA-SEMS_0044866 at 44945. Birch testified that in the early 1970s, waste water at the Farmington Plant was either disposed of into the previously existing septic tank field or discharged on to the ground because the Plant was not connected to the municipal sewage system. Ex. 19, Birch Depo. Vol. VI, p. 910:12–17, EPA-SEMS_0045362 at 454534.

[85]    Ex. 20, EPA-SEMS_0002093 at 2107.

washing and inadvertent chemical spills" drained to that septic system after finding VOCs in the vicinity.[86]

### 1978 – 1986: The Ex-Cell-O Years

In 1978, Ex-Cell-O acquired McCord Maine, which was reorganized as McCord Michigan, and Davidson Rubber.[87] Although Defendant was officially organized as Ex-Cell-O's subsidiary, Ex-Cell-O regularly referred to this transaction internally and in corporate shareholder reports as a "merger" with Defendant.[88] After this "merger," Ex-Cell-O replaced Defendant in operating the Farmington Plant, where manufacturing processes stayed "relatively the same" during this time.[89] Moreover, Ex-Cell-O and Davidson Rubber "continued to discharge contaminated water into the lagoon system" during this time period. *Fireman's Fund Ins. Cos.*, 750 F. Supp. at 1349–50.

As in the McCord Maine era, Davidson Rubber was frequently publicly represented on corporate letterhead as a "division of Ex-Cell-O,"[90] including to EPA and State environmental regulators. Davidson Rubber identified Ex-Cell-O as the "legal owner" and "operator" of the Farmington Plant on its Resource Conservation and Recovery Act (RCRA) permit applications

---

[86]    *Id.* at 2095, 2107.

[87]    Ex. 14, McCord § 104(e) Response, EPA-SEMS_0044321 at 44323, 44423, 44427.

[88]    Ex. 52, McCord0027055; Ex. 13, EPA-SEMS_0062082 at 62086, 62103–04; Ex. 53, EPA-SEMS_0062110 at 62113, 62124–26, 62131; *see also* Ex. 16, Birch Depo. Vol. I, p. 6:2–13, EPA-SEMS_0044866 at 44872.

         Despite such descriptions, Defendant continued to exist during this time period. *See*, *e.g.*, Ex. 54, McCord0027256; Ex. 55, McCord0027219.

[89]    *E.g.*, Ex. 10, Williams Depo. Vol. I, pp. 103–04, EPA-SEMS_0069176 at 69278–79.

[90]    *E.g.*, Ex. 56, EPA-SEMS_0057481; Ex. 57, EPA-SEMS_0002586; Ex. 5, Leistra-Jones Report, ¶ 79.

submitted to EPA under penalty of perjury.[91] Both EPA and the State responded to staff at "Ex-Cell-O Corporation, Davidson Rubber Division," identifying deficiencies in the permit application for the Plant.[92] The New Hampshire Air Resources Agency issued operating permits to the Farmington Plant in the name of "Davidson Rubber Co., Ex-Cell-O Corp." and "Davidson Rubber, Ex-Cell-O Corp.," that were valid between May 1979 and December 1986.[93] In 1981, the New Hampshire Bureau of Solid Waste Management issued a Regulatory Order to "Howard Williams, Davidson Rubber Division, Ex-Cell-O Corporation," identifying improper disposal of methylene chloride still bottom drums from the Farmington Plant and other hazardous waste concerns.[94] Likewise, in October 1983, the State issued a Notice of Violation to "Davidson Rubber Division" following the identification of VOCs in waters at and near the Farmington Plant.[95]

When Ex-Cell-O took over operation of the Plant, Birch continued as Ex-Cell-O's Director of Energy and Environmental Affairs.[96] In that role, Birch attended hazardous waste and RCRA trainings to develop Ex-Cell-O's environmental compliance program.[97] Birch implemented an "environmental audit" program to inspect Ex-Cell-O's facilities, identify regulatory violations, and issue corrective actions, including concerns that Birch described as

---

[91]    Ex. 58, EPA-SEMS_0045759 at 45760, 45762; Ex. 56, EPA-SEMS_0057481 at 57482.

[92]    Ex. 59, EPA-SEMS_0028740; Ex. 60, EPA-SEMS_0028756; *see also* Ex. 61, EPA-SEMS_0028773 (explaining permitting authority under RCRA); Ex. 62, EPA-SEMS_0029959 (directed to Howard Greenlaw, Davidson Rubber Division).

[93]    Ex. 14, McCord § 104(e) Response, EPA-SEMS_0044321 at 44750–68.

[94]    Ex. 63, EPA-SEMS_0023640.

[95]    Ex. 64, EPA-SEMS_0004308.

[96]    Ex. 16, Birch Depo. Vol. I, pp. 2:18–23, 6:2–13, EPA-SEMS_0044866 at 44868, 44872.

[97]    *Id.*, pp. 33–34, 38, EPA-SEMS_0044866 at 44899–44900, 44904.

"things that they better damn well fix like right now."[98] He visited the Plant in April 1982, to

"solve the problem of the drum accumulation," following the State's December 1981 Regulatory

Order.[99] And in 1985, he facilitated an appropriations request for $120,000 from Ex-Cell-O for

Davidson Rubber to pay for a waterline for nearby residents whose wells had been contaminated

by groundwater pollution from a nearby landfill where the Plant had sent wastes for disposal.[100]

Birch was not the only Ex-Cell-O employee who stepped in on Davidson Rubber's behalf

in response to its pollution problems and environmental compliance efforts. Terrence Filipiak,

another Ex-Cell-O employee, also conducted sampling, inspections, and audits at the Farmington

Plant. In November 1981, Filipiak analyzed samples of the Plant's heat transfer oil for

polychlorinated biphenyls to determine environmental compliance. In September 1982,

following the State's December 1981 Regulatory Order, Filipiak identified several regulatory

concerns at the Plant, directing Davidson Rubber employees to change practices or face

regulatory consequences:

> Other areas which require attention noticed during my visit include: The continued
> buildup of methylene chloride contaminated foam with no solution for disposal,
> material substitutions and/or provisions for secure storage. This situation is subject
> to fine by the EPA because of the current poor storage practice used.
>
> The discharge of heat transfer oil and plastisol to the lagoon with a resulting oil
> slick and oil soaked lagoon soils must be stopped immediately, with cleanup of
> soils and surface waters or face a citation from local environmental agencies.
> Disposal of this material must be made through a waste processor or hazardous
> waste facility.
>
> The water/oil discharge from the air compressors onto surface soils on the north
> side of the plant is a violation of EPA 40CFR112 and is subject to citation. An oil

---

[98]     *Id.*, pp. 112–14, EPA-SEMS_0044866 at 44978–80.

[99]     Ex. 65, Birch Depo. Vol. II, pp. 281–84, EPA-SEMS_0045036 at 45151–54; *see* Ex. 63,
EPA-SEMS_0023640.

[100]    Ex. 66, EPA-SEMS_0045793; Ex. 67, EPA-SEMS_0045795.

separation tank should be placed to collect all discharges, with the periodic draining of the floating oils to a waste oil holding area for reclaim.

The discharge of paint to the northeast plant storm drain by employees must be halted immediately, with the reprimand of those responsible employees. The State of New Hampshire forbids the discharge of any foreign materials into a storm water system other than storm water, the impact on area waters could be devastating (fish kill, stream discoloration, etc.).[101]

In December 1985, Filipiak conducted an environmental audit of the Plant and identified multiple regulatory violations and necessary corrective action.[102]

Birch and Walter Vashak, Ex-Cell-O's corporate in-house counsel, also helped resolve Davidson Rubber's CERCLA liability related to another Superfund Site. In 1983, EPA and the State of Massachusetts notified Davidson Rubber that it was a potentially responsible party at the Silresim Site, a Superfund Site in Massachusetts, where Farmington Plant waste had been sent.[103] Birch, Vashak, and Howard Williams planned to attend a settlement meeting that year on behalf of Davidson Rubber.[104] Vashak responded to EPA on behalf of Davidson Rubber,[105] and he negotiated Ex-Cell-O's settlement payment on behalf of Davidson Rubber regarding its liability for the Silresim Site.[106] Vashak further directed Davidson Rubber staff that he and Birch "must be kept advised of developments" regarding methylene chloride disposal issues as early as

---

[101]    Ex. 68, EPA-SEMS_0045722 at 45723–24 (emphasis added).

[102]    Ex. 69, McCord0026295.

[103]    *E.g.*, Ex. 65, Birch Vol. II, 309–12, EPA-SEMS_0045036 at 45179–82.

[104]    *Id.*, pp. 313–15, EPA-SEMS_0045036 at 45183–85; Ex. 70, EPA-SEMS_0045768; Ex. 71, EPA-SEMS_0045617. According to the meeting registration form, only Birch and Vashak attended. Ex. 70, EPA-SEMS_0045768.

[105]    Ex. 70, EPA-SEMS_0045768 (identifying Davidson Rubber as a "subsidiar[y] of Ex-Cell-O").

[106]    Ex. 72, EPA-SEMS_0045781; Ex. 73, EPA-SEMS_0045788.

1981,[107] and in a later memo to Howard Williams, insisted that it was "<u>imperative</u>"[108] that he be kept apprised of contacts with state and federal enforcement authorities.

*1986 – 1990: Insurance Litigation in the Eastern District of Michigan*

Facing growing environmental liability under new federal environmental statutes, including CERCLA, Ex-Cell-O, McCord, and Davidson Rubber (the Policyholders) sought insurance coverage for the various legal claims affecting the Farmington Plant and other Ex-Cell-O properties.[109] After the insurance carriers denied claims, litigation ensued, which produced dozens of depositions of Policyholder employees and others, along with a multiday bench trial. *Fireman's Fund Ins. Cos.*, 750 F. Supp. at 1343–44. During trial, the Policyholders argued that groundwater contamination at the Farmington Plant was the result of "two sudden and accidental chemical spills" in 1977 and 1978, and thus under Michigan law, they were entitled to coverage for property damage under their insurance contracts. *Id.* at 1348.

However, the district court rejected that assertion, finding that the evidence instead demonstrated that the groundwater contamination was a direct result of historic, regular operations at the Farmington Plant:

> The design and operation of the Farmington [P]lant facilitated disposal of hazardous liquid waste directly into the environment. Davidson [Rubber] made various modifications to its operation over the years. Initially, waste water was discharged into the Pokamoonshine Brook tributary, then onto the north end of the property, and later into the lagoon system. Consistent, however, throughout these changes was policyholders' direct discharge of contaminants into the environment.

*Id.* at 1351. After describing the various wastewater discharges across Farmington Plant property throughout the early 1970s, the court highlighted the delayed 1973 expenditure and the

---

[107]    Ex. 74, EPA-SEMS_0026144.

[108]    Ex. 75, EPA-SEMS_0045787 (emphasis in original).

[109]    *E.g.*, Ex. 76, EPA-SEMS_0045784.

construction of the lagoons, despite the knowledge that (1) the ongoing water pollution gave rise to potential liability and (2) the lagoons could result in groundwater contamination. *Id.* at 1351–53. Further, the court found evidence that contaminated discharges continued through the 1980s. *Id.* at 1349–50. Accordingly, the court found that because the Policyholders expected their intentional acts of waste disposal would result in environmental damage, they were not entitled to insurance coverage under Michigan law. *Id.* at 1353–54.

### 1986 – 2009: Restructuring and the Collins & Aikman Bankruptcy

Concurrently, the Policyholders restructured. In 1986, Ex-Cell-O was liquidated, and Defendant, Davidson Rubber, and other assets and liabilities of Ex-Cell-O were transferred to other entities. In 1987, Davidson Rubber was renamed Davidson Textron, Inc., which was later renamed Textron Automotive Interiors, Inc., in 1995.[110] In 2001, Collins and Aikman Products Company purchased Textron Automotive Interiors, Inc., renaming it Collins and Aikman Automotive Interiors, Inc.[111] In 2005, Collins and Aikman Corporation filed for bankruptcy for itself and its subsidiaries, including Collins and Aikman Automotive Interiors, Inc.[112] As a part of the Collins & Aikman bankruptcy settlement, the New Hampshire Custodial Trust (the Trust) took title to the Site.[113]

### 2009 – Present: State and Federal Remediation Begins

Upon transfer of title of the Farmington Plant to the Trust, EPA and the State investigated the extent of contamination and potential remedies. In 2013, EPA listed the Site on the National

---

[110]    Ex. 14, McCord § 104(e) Response, EPA-SEMS_0044321 at 44328, 44404.

[111]    *Id.*, EPA-SEMS_0044321 at 44330, 44404–06, 44579–83.

[112]    Ex. 77, Order Confirming First Amended Joint Plan of Collins and Aikman Corp. and Its Debtor Subsidiaries, ECF No. 7827, (July 18, 2007 Order) p.1 & ¶ A, EPA-SEMS_0020784 at 20784, 20786.

[113]    *Id.*, ¶¶ 72–73, 75, EPA-SEMS_0020784 at 20829–31.

Priorities List. 78 Fed. Reg. 75,475, 75,478 (Dec. 12, 2013). In December 2014, EPA began a

Remedial Investigation of the Site in coordination with NHDES.[114] Once EPA completes the

Remedial Investigation and a Feasibility Study to assess potential remedy options, EPA expects

to propose a remedy to remediate the Site, which will be subject to public comment, in

accordance with NCP regulations. *See* 40 C.F.R. § 300.430(a)(2), (d)–(e), (f)(3).

Although EPA's and NHDES's remedial processes are underway, they have found VOCs

in the groundwater originating from the Farmington Plant.[115] EPA and NHDES identified

relevant sources of contamination, including an area near the former percolating lagoons to their

east and the northwest septic leach field on-site associated with the 1977 Farmington Plant

expansion, as well as other areas on the Site near the Plant.[116]

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex

Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Carmona v. Toledo*, 215 F.3d 124, 132 (1st Cir.

2000). The moving party bears the burden of demonstrating the absence of a genuine issue of

material fact. *Carmona*, 215 F.3d at 132. A genuine issue occurs when it is "such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986). "[T]he substantive law will identify which facts are material," and

"[o]nly disputes over facts that might affect the outcome of the suit under the governing law" are

material. *Id.* Although the court must view the factual record in the light most favorable to the

---

[114]    Ex. 8, Hull Decl., ¶ 5.

[115]    *Id.*, ¶ 5.

[116]    *Id.*, ¶ 5. These locations are consistent with Davidson Rubber's 1986 remedial
investigation. Ex. 20, EPA-SEMS_0002093 at 2095, 2107.

non-moving party, see *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009) (citation omitted), where the moving party has met its burden, its opponent "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the non-moving party must demonstrate that a trier of fact could reasonably resolve the issue in his or her favor by setting forth affirmative evidence that is "significantly probative of specific facts," not resting on mere allegations or denials. *Perez v. Volvo Car Corp.*, 247 F.3d 303, 317 (1st Cir. 2001).

Because CERCLA imposes strict liability and recognizes few defenses, courts routinely use partial summary judgment to resolve CERCLA liability issues, while leaving other issues—such as the amount of recoverable costs—as here—for later resolution. *See, e.g.*, *United States v. Mottolo*, 695 F. Supp. 615, 620 (D.N.H. 1988) ("summary judgment may be rendered as to liability even if there is a genuine issue as to appropriate damages"), *aff'd* 26 F.3d 261 (1st Cir. 1994).

## ARGUMENT

Response costs under CERCLA are recoverable against: (1) any person; (2) who owned or operated; (3) a facility; (4) from which hazardous substances were released; if (5) those costs are not inconsistent with the NCP. 42 U.S.C. § 9607(a)(2); *see also Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1150 (1st Cir. 1989). Liability under CERCLA Section 107(a) is strict and joint and several. *Dedham Water Co.*, 889 F.2d at 1150; *Mottolo*, 695 F. Supp. at 629. Similarly, under New Hampshire RSA 147-B, any person who owned or operated a facility where a release of hazardous waste or hazardous material occurred is strictly liable for response costs incurred. N.H. RSA 147-B:10, I.

The Parties have stipulated to almost all the elements under CERCLA and New
Hampshire law, *supra* at 2, and Defendant has admitted that it is the successor to McCord Maine
and Ex-Cell-O. Therefore, the sole issue remaining for this Court to determine liability is
whether McCord Maine and/or Ex-Cell-O, which were succeeded by Defendant, operated[117] the
Farmington Plant. Plaintiffs offer two reasons for the Court to find that McCord Maine and/or
Ex-Cell-O operated the Farmington Plant. First, these companies directly operated the Plant
under *Bestfoods*, 524 U.S. 51. Alternatively, McCord Maine and Ex-Cell-O treated Davidson
Rubber as their internal division, and this Court may do so as well to avoid frustrating the
purpose of CERCLA. Plaintiffs also seek summary judgment on Defendant's affirmative defense
AA, alleging that any claims against it were discharged by the bankruptcy of Collins & Aikman
Automotive Interiors. Because Defendant was not a party to that bankruptcy, admits that it was
not a debtor, and has offered no evidence in support of its defense, there is no genuine dispute of
material facts, and Plaintiffs are entitled to summary judgment on this defense.

## I.    Defendant Is the Successor to McCord Maine and Ex-Cell-O, Persons Under CERCLA.

CERCLA and New Hampshire law include "corporations" in the list of persons that can
be liable under the statute. *See* 42 U.S.C. § 9601(21); N.H. RSA 147-B:2, IX. The term
"corporations" extends to successors, "to prevent corporations from evading liabilities through
changes of ownership when there is a buy out or merger." *United States v. Mex. Feed & Seed
Co., Inc*., 980 F.2d 478, 487 (8th Cir. 1992). Thus, CERCLA liability extends to corporate
successors of former operators. *See John S. Boyd Co.*, 992 F.2d at 404–05; *Kleen Laundry*, 867

---

[117]    Plaintiffs do not dispute that Davidson Rubber also operated the Farmington Plant.

F. Supp. at 1140 (imposing successor liability to avoid shifting remediation costs onto the public).

Defendant stipulated that it is a person under CERCLA and New Hampshire law.[118] By extension, both McCord Maine and Ex-Cell-O were also persons under CERCLA and New Hampshire law. 42 U.S.C. § 9601(21); N.H. RSA 147-B:2, IX. Defendant has also admitted that it is the successor to both McCord Maine and Ex-Cell-O.[119] Any environmental liabilities attributable to McCord Maine and Ex-Cell-O are therefore attributable to Defendant as the successor to both corporations. *See, e.g.*, *John S. Boyd Co.*, 992 F. 2d at 404–05.

## II.    **Under *Bestfoods*, Defendant Operated the Farmington Plant.**

Plaintiffs first argue that McCord Maine and Ex-Cell-O operated the Farmington Plant, both through the actions of their agents and by violating established norms of oversight. *Bestfoods*, 524 U.S. at 71–72. Under *Bestfoods*, the Court recognized that corporate parents that manage and make decisions about pollution or environmental compliance are liable under CERCLA. *Id.* at 66–67. Here, Richard Birch, McCord Maine's Manager of Safety and Ecology, was intimately involved in addressing the long-running problem of wastewater discharges at the Farmington Plant. He also managed an expansion of the Plant that included the design and installation of a septic system that resulted in groundwater contamination. Birch's actions stepped far over the line of corporate norms of parent oversight into the details of Plant operations specifically concerning pollution and environmental compliance. Further, Defendant failed to produce any documents demonstrating that McCord Maine or Ex-Cell-O formally authorized Birch to perform these services for Davidson Rubber, indicating a violation of corporate norms. Ex-Cell-

---

[118]    Amended Joint Stip., ECF No. 33 ¶ 4.

[119]    Ex. 2, McCord Response to Requests for Admission Nos. 4–8, 17–19.

O also failed to respect corporate norms with respect to environmental affairs and operations at the Plant. Therefore, the Court should find Defendant liable as an operator as the successor to McCord Maine and Ex-Cell-O.

A.    *Bestfoods and Its Progeny*

CERCLA defines "owner or operator" as "any person owning or operating" a facility. 42 U.S.C. § 9601(20)(A). Parent companies are not typically responsible for their subsidiaries' liabilities. *Bestfoods*, 524 U.S. at 61. However, the Supreme Court recognized an "equally fundamental principal" of corporate law, that the corporate veil may be pierced, and the parent held liable, when the corporate form would be otherwise abused to accomplish certain wrongful purposes. *Id*. at 62. Thus, the Court distinguished between veil piercing—otherwise known as indirect liability—and direct operator liability, which is at issue here: veil-piercing inquiries usually apply to the relationship between the parent and subsidiary,[120] whereas direct operator liability hinges on the parent's relationship <u>with the facility</u>. Under the plain language of CERCLA, any person who operates a polluting facility is directly liable for the costs of cleaning up the pollution:

> [U]nder CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

*Id.* at 66. The Court suggested at least three possible ways that a parent company could so expose itself to liability:

> [1] [A] parent can be held directly liable when the parent operates the facility in the stead of its subsidiary or alongside the subsidiary in some sort of joint venture. [2] We anticipated a further possibility above, however, when we observed that a dual

---

[120]     Plaintiffs do not allege a veil-piercing theory of liability.

> officer or director might depart so far from the norms of parental influence exercised through dual officeholding as to serve the parent, even when acting on behalf of the subsidiary in operating the facility. [3] Yet another possibility . . . is that an agent of the parent with no hat to wear but the parent's hat might manage or direct activities at the facility.

*Id.* at 71 (citations omitted). The Court emphasized that the relevant norms of parental oversight of a subsidiary's facility generally relate to the parent's "investor status." *Id.* at 72.

The seminal case in the First Circuit examining *Bestfoods* found direct parental liability under facts similar to those presented here. *United States v. Kayser-Roth*, 272 F.3d 89 (1st Cir. 2001). The First Circuit focused on parental involvement with "operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* at 102 (quoting *Bestfoods*, 524 U.S. at 66–67). There, the parent company was found liable as an operator under CERCLA based on the facts that the parent company: (1) knew that the subsidiary's manufacturing process involved certain hazardous substances; (2) mandated a cost-benefit study and then approved that manufacturing process; (3) directed its subsidiaries to notify the parent's legal department of contact by environmental regulators; and (4) settled a federal environmental lawsuit on behalf of the subsidiary. *Id.*

The First Circuit affirmed the District Court's finding that a vice president of the parent company "directly exerted operational control over environmental matters at the . . . facility." *Id.* at 103. That executive directed cost studies to evaluate a known wastewater problem; rejected and approved certain treatment options; and "played a critical leadership role in the settlement of a separate EPA action . . . ." *Id.* at 103–04. Because this executive acted on behalf of the parent company, "with no hat to wear but the parent's," and took actions that "went far beyond the

'norms of parental oversight,'" the First Circuit affirmed the district court's finding that the parent company was an operator. *Id*. (quoting *Bestfoods*, 524 U.S. at 57, 66–67).

Other courts have found parent corporations liable for managing pollution-related projects and environmental compliance, including plant construction and engineering design related to waste disposal. *Union Pac. R.R. Co. v. Oglebay Norton Minerals, Inc.*, EP-17-CV-47-PRM, 2018 WL 1722175, at * 7, 12 (W.D. Tex. Apr. 9, 2018) (on a motion for summary judgment, finding parent liable through its employees' actions that were responsible for environmental decision-making and compliance); *Basic Mgmt. Inc. v. United States*, 569 F. Supp. 2d 1106, 1116 (D. Nev. 2008). In *Basic Management*, the district court granted summary judgment, finding that the corporate parent "expanded the plant's waste management ponds, installed new caustic waste disposal lines . . . acquired waste storage equipment, erected protective fencing, and supervised the operation of other waste management systems." *Id.* at 1111; *see also Am. Cyanamid Co. v. Capuano*, 381 F.3d 6, 22–24 (1st Cir. 2004) (affirming district court finding of parent's operator liability for who, among other things, developed idea for using site to dump hazardous waste); *United States v. Sterling Centrecorp Inc.*, 960 F. Supp. 2d 1025, 1050 (E.D. Cal.2013) (defendant liable because its "pervasive control and management" over the facility "exceeded actions typically associated with a parent's investor status") *aff'd* 977 F.3d 750, 757–60 (9th Cir. 2020); *cf. N. States Power Co. v. City of Ashland*, 93 F. Supp. 3d 958, 973–74 (W.D. Wis. 2015) (denying defendant's motion for summary judgment due to evidence of its direct involvement in constructing a gas plant).

B.    *Defendant Operated the Farmington Plant via Its Employees.*

Defendant's direct management of the Farmington Plant's wastewater pollution through Birch, Filipiak, and Vashak went far beyond McCord Maine's "investor status" as a parent. The

undisputed evidence demonstrates that Birch's and other employees' involvement far exceeded activities like monitoring Davidson Rubber's performance, supervision of its finance and capital budget decisions, and articulation of general policies and procedures that would not ordinarily give rise to direct liability. *See Bestfoods*, 524 U.S. at 72. Birch, wearing only the hat of McCord Maine, directed wastewater management efforts, managed environmental compliance, and directly supervised expansion of the Farmington Plant's septic system. Each of these actions is sufficiently "eccentric under accepted norms of parental oversight of a subsidiary's facility" to incur liability for Defendant. *Id.*

     1. <u>Birch Managed Efforts to Control Wastewater at the Farmington Plant.</u>

     Starting in 1971, Birch was employed by McCord Maine as Manager for Safety and Ecology, based out of Detroit.[121] In this role, Birch was directly involved in and managed efforts to control the ongoing wastewater problems at the Farmington Plant. In the same year, Birch visited the Farmington Plant[122] and identified poor housekeeping as a source of wastewater contamination.[123] He specifically proposed five actions "be done on [a] crash basis" to better contain waste at the Plant and alleviate pollution.[124] In December 1971, Birch was the first to propose investigating whether a retention lagoon could reduce effluent discharged from the Farmington Plant.[125] By identifying specific sources of pollution, directing waste management,

---

[121]    Ex. 16, Birch Depo. Vol. I, p. 5:20–5, EPA-SEMS_0044866 at 44871; Ex. 17, EPA-SEMS_0062502 at 62513.

[122]    Ex. 25, EPA-SEMS_0045733; Ex. 26, EPA-SEMS_0045734.

[123]    Ex. 23, EPA-SEMS_0045608.

[124]    *Id.* Davidson Rubber staff implemented all of Birch's recommendations, except one that was deemed infeasible.

[125]    Ex. 26, EPA-SEMS_0045734; Ex. 19, Birch Depo. Vol. VI, at pp. 901–03, EPA-SEMS_0045362 at 45444–46.

and proposing corrective action, Birch's actions triggered operator liability as early as 1971. *See Kayser-Roth*, 272 F.3d at 103; *Basic Mgmt.*, 569 F. Supp. 2d at 1116.

Birch's efforts to control the wastewater problem grew in 1974. After the initial appropriations request for a proposed wastewater treatment system was deferred—despite having been approved by Davidson Rubber's own management—Birch visited the Farmington Plant in April 1974 and directed Davidson Rubber to prepare a new appropriations request, stating that he would "see that it does not get hung up in Detroit."[126] In that memorandum, Birch directed Davidson Rubber staff to implement several short-term water treatment steps and to keep him apprised when Davidson Rubber internally approved the appropriations request.[127] Birch also projected that the wastewater problem would grow in scope, with new operations that would increase water consumption by up to 25,000 gallons per day.[128]

In the appropriations request sent to McCord Maine in May 1974, Davidson Rubber advised that "this program has been reviewed with Dick Birch on two occasions this past year and had his endorsement."[129] In fact, Birch was identified as one of the managers "primarily responsible" for selecting the lagoon system for disposal.[130] Following the approval of the appropriations request, Birch continued to remain involved, reviewing wastewater treatment study schedules[131] and technical plans requiring Commission approval.[132] *See Kayser-Roth*, 272

---

[126]     Ex. 40, EPA-SEMS_0027756 at 27758.

[127]     *Id.* at 27757–58.

[128]     *Id.* at 27756.

[129]     Ex. 41, EPA-SEMS_0027774 at 27775 ¶ 3.

[130]     Ex. 21, Hynes Depo. p. 141:17–22, EPA-SEMS_0047516 at 47657.

[131]     Ex. 42, EPA-SEMS_0027871.

[132]     Ex. 46, EPA-SEMS_0043806 at 44121–22.

F.3d at 102 ("Kayser-Roth made the ultimate decision to acquire the dry cleaning process using TCE.").

Birch's management also included regular updates from Davidson Rubber's environmental consultants over the years. In December 1971, Birch was copied on notes from Davidson Rubber's meeting with its consultant to discuss the lagoon that Birch had proposed earlier that month.[133] Later, in 1972, Birch stated that the environmental consultant's water re-use proposal was adequate with certain stipulations, to which Davidson Rubber agreed and its consultant subsequently complied.[134] Even though Davidson Rubber also communicated with the environmental consultants, Birch's detailed familiarity with such technical details and close involvement with Davidson Rubber's consultant exceeded the norms of parental oversight.[135] *E.g.*, *Sterling Centrecorp*, 960 F. Supp. 2d at 1047 (environmental consultant directly contacted parent company, which operated Site alongside its subsidiary); *Browning-Ferris Indus. of Ill., Inc. v. Ter Maat*, 13 F. Supp. 2d 756, 764–65 (N.D. Ill. 1998) (finding parent company liable as operator in part because of direct communications with consultant), *aff'd in part, rev'd on other grounds* 195 F.3d 953 (7th Cir. 1999); *cf. LeClercq v. Lockformer Co.*, No. 00-C-7164, 2002 WL 908037, at *2–3 (N.D. Ill. May 6, 2002) (parent's actions to manage and direct operations at the facility, including involvement with division's environmental consultant, prevented court from granting summary judgment in favor of defendants).

Notably, Davidson Rubber did not employ anyone who held an equivalent position at the Farmington Plant until at least 1976, when Howard Williams became Davidson Rubber's

---

[133]    Ex. 24, EPA-SEMS_0027414 at 27414–15; Ex. 26, EPA-SEMS_0045734.

[134]    Ex. 27, EPA-SEMS_0027669 at 27669–70; Ex. 29, EPA-SEMS_0045742.

[135]    Ex. 5, Leistra-Jones Report, ¶¶ 67–69.

Manager of Safety and Environmental Affairs in Dover.[136] *See United States v. Newmont USA Ltd.*, No. CV-05-020-JLQ, 2008 WL 4621566 at *51 (E.D. Wash. Oct. 17, 2008) (in finding parent operated a mine, noting that subsidiary's employee lacked knowledge to direct mining operations). Directives that Birch issued to the Plant were on McCord letterhead, reflecting his role as a McCord Maine employee.[137] *See Sterling Centrecorp*, 960 F. Supp. 2d at 1047–48 (parent's letterhead was regularly used in correspondence on subsidiary's behalf). The *Fireman's Fund* court characterized Birch as a "corporate environmental analyst." 750 F. Supp. at 1352. As such, he could have only been McCord Maine's agent. *Kayser-Roth*, 272 F.3d at 103 (an employee of a parent who is neither an officer nor a director of a subsidiary serves only the parent); *Union Pac. R.R. Co.*, 2018 WL 1722175, at *8 (citing *Bestfoods*, 524 U.S. at 72).

    2. Birch, Filipiak, and Vashak Managed Environmental Compliance Efforts at the Farmington Plant.

Additionally, Birch oversaw environmental compliance efforts at the Farmington Plant. Following the passage of the Clean Water Act, Birch planned to visit the Farmington Plant and sample effluent to assess pollution control requirements and their costs for the Plant.[138] Birch also interceded on behalf of the Farmington Plant related to its Clean Water Act compliance, calling an EPA official to request less stringent sampling requirements under the Farmington

---

[136]    Ex. 10, Williams Depo. Vol. I, pp. 13, 29–30, EPA-SEMS_0069176 at 69188, 69204–05. Williams testified that there was no one to his knowledge that was in charge of waste disposal and pollution control at the Farmington Plant in the early 1970s, and he was not aware that EPA had been involved in any way at the Farmington Plant, despite the fact that Birch had personally negotiated a NPDES permit for the Farmington Plant in 1974. *See id.*, p. 28, EPA-SEMS_0069176 at 69203; Ex. 18, Williams Depo. Vol. II, p. 65, EPA-SEMS_0069365 at 69430.

[137]    Ex. 40, EPA-SEMS_0027756; Ex. 30, EPA-SEMS_0027730 at 27731–32; Ex. 27, EPA-SEMS_0027669 at 27670.

[138]    *See supra* note 48.

Plant's discharge permit,[139] and he was copied on the Plant's related monthly monitoring reports

sent to EPA in 1974 and 1975, including the Plant's first discharge permit application.[140] In

urging the construction of the lagoons at the Farmington Plant, Birch advised that the Plant was

in legal jeopardy because of its discharges:

> This water is . . . creating a foul waste with very poor visual characteristics, being milky in appearance and leaving any grass and shrubbery in its path blackened and dead. . . . We are and have been in violation of the law by not applying for an EPA Discharge Permit for this waste.[141]

*See Kayser-Roth*, 272 F.3d at 104 (parent's vice-president who "played a central role in

environmental compliance . . . and specifically the decision to implement the cleaning process

that used [a hazardous substance] . . . went far beyond the 'norms of parental oversight . . .'").

During the 1980s, Birch, Filipiak, and Vashak managed pollution control efforts and

environmental compliance at the Farmington Plant. Birch visited the Plant in April 1982 to

attempt to resolve a drum storage problem, and alongside Ex-Cell-O's in-house counsel, Walter

Vashak, Birch helped resolve Davidson Rubber's CERCLA liability tied to disposal of waste

sent from the Farmington Plant to another Superfund Site.[142] *See id.* (parent employee "played a

critical leadership role in the settlement of a separate EPA action"). As such, Vashak insisted that

he serve as the primary link between Davidson Rubber and its outside counsel at the outset of the

insurance litigation.[143] *See id.* at 102 (parent issued "directive" requiring that parent's legal

---

[139]    Ex. 31, EPA-SEMS_0027738.

[140]    *See supra* note 51; Ex. 22, EPA-SEMS_0045739 (1971 discharge permit application).

[141]    Ex. 40, EPA-SEMS_0027756 at 27756–57 (emphasis added); *Fireman's Fund Ins. Cos.*, 750 F. Supp. at 1352.

[142]    Ex. 65, Birch Depo. Vol. II, pp. 281–82, 309–12, EPA-SEMS_0045036 at 45151–52, 45179–82; Ex. 5, Leistra-Jones Report ¶¶ 96–97.

[143]    Ex. 75, EPA-SEMS_0045787.

department "be notified of any governmental agency or court contact regarding environmental matters."). In the early 1980s, Filipiak visited the Farmington Plant, reviewed sampling, and issued a memo directing certain operational changes be made to avoid liability, which threatened disciplinary action of Davidson Rubber employees.[144] Birch, Filipiak, and Vashak were directly involved in environmental compliance at the Farmington Plant on Ex-Cell-O's behalf. Therefore, according to *Bestfoods* and *Kayser-Roth*, Ex-Cell-O operated the Farmington Plant.

   3. Birch Managed Expansion of the Farmington Plant Septic System.

   Birch directly managed the Farmington Plant's 1977 expansion, which placed him at the Plant almost daily.[145] This expansion included construction of a sewage waste disposal system.[146] Even before the expansion, Birch was knowledgeable enough about the Plant to know that some of the wash line drains were routed to roof drains.[147] Birch's extensive knowledge of the Farmington Plant's drainage and disposal pathways meant that he was the person with sufficient expertise to understand and approve the Plant's construction plans, including the septic system.[148] *See Newmont USA*, 2008 WL 4621566, at *53 (only parent employees had any expertise in mining operations, which exceeded norms of parental oversight). Consequently, Birch was the "principal owner's representative in connection with" this expansion,[149] and he

---

[144]    Ex. 14, McCord § 104(e) Response, EPA-SEMS_0044321 at 44335, 44823–24; Ex. 68, EPA-SEMS_0045722 at 45723–24; *see also Fireman's Fund Ins. Cos.*, 750 F. Supp. at 1349 ("While inspecting a lagoon system on the plant grounds, Filipiak found unacceptably high levels of hazardous solvents and metals.").

[145]    Ex. 16, Birch Depo. Vol. I, pp. 61:3–8, 20–24, 62:16–22, 63:8–10, 77:17–23, EPA-SEMS_0044866 at 44927–29, 44943.

[146]    Ex. 49, EPA-SEMS_0028054.

[147]    *See* Ex. 19, Birch Depo. Vol. VI, pp. 912, 927–28, EPA-SEMS_0045362 at 45456, 45471–72.

[148]    *Id.*, p. 910:12–17, EPA-SEMS_0045362 at 45454.

[149]    *See* Ex. 16, Birch Depo. Vol. I, p. 77:17–22, EPA-SEMS_0044866 at 44943.

received plans from Davidson Rubber's consultant, who sought Birch's technical and financial approvals.[150] In managing this expansion and septic leach field construction, Birch directly oversaw the construction of a second stream of wastewater that turned out to be a source of contamination at the Farmington Plant. *See Basic Mgmt.*, 569 F. Supp. 2d at 1116.

4. Birch's Involvement at the Plant Violated Corporate Norms.

Birch's heavy involvement with pollution management and environmental compliance at the Farmington Plant far exceeded the kind of parental involvement at a facility that does not usually give rise to direct liability. *See Bestfoods*, 524 U.S. at 72; *Newmont USA*, 2008 WL 4621566, at *53.

Courts commonly consider expert opinions on corporate norms in *Bestfoods* cases. *E.g.*, *Newmont USA*, 2008 WL 46215622 at *51; *Pinal Creek Grp. v. Newmont Mining Grp.*, 352 F. Supp. 2d 1037, 1044–47 (D. Ariz. 2005) (court admitted expert opinions on corporate norms but excluded opinions on legal issues). As noted above, Plaintiffs' expert, Dan Leistra-Jones is an expert with more than 15 years of experience in financial and corporate analysis of more than 300 hundred companies, with particular emphasis on norms, corporate finance, and organization.[151] He has offered expert trial, hearing, and/or deposition testimony in cases relating to piercing the corporate veil, owner/operator liability, fraudulent conveyance, company financial health, and economic benefit gained from noncompliance, among other issues, and he has been qualified as an expert in five separate matters.[152] As Mr. Leistra-Jones explains that typically, separately functioning corporate entities should formalize significant transactions, such

---

[150]    Ex. 48, EPA-SEMS_0028053.

[151]    Ex. 5, Leistra-Jones Report, ¶¶ 9 - 10.

[152]    Ex. 4, Decl. Leistra-Jones, ¶ 5.

as in written management services agreements between parent companies and subsidiaries.[153]

Similarly, employees of one company temporarily assigned to work at another company would usually work under a "secondment agreement," which specifies the employee's responsibilities, salaries, benefits, tax liabilities, and other issues related to that temporary assignment.[154] "A lack of documentation for major corporate and financial decisions indicates the breakdown in adherence to these types of corporate norms."[155] Similarly, evidence of significant actions taken by a parent on behalf of its subsidiary, without a managerial services or secondment agreement, also indicates a breakdown of corporate norms.[156]

Here, the United States sought discovery from Defendant for consulting contracts, agreements, or other arrangements for waste management or disposal, pollution management, disposal of hazardous substances, environmental management, environmental regulatory compliance services, and any services specifically provided by Birch or others during the relevant time periods between the relevant corporate entities.[157] Defendant responded that it had no such documents.[158]

For all of Birch's extensive—and undisputed—involvement at the Farmington Plant,[159] there is <u>no</u> evidence of any written agreements between his employers and Davidson Rubber for

---

[153]    Ex. 5, Leistra-Jones Report, ¶ 38.

[154]    *Id.*, ¶ 38.

[155]    *Id.*, ¶ 39.

[156]    *Id.*, ¶ 40.

[157]    Ex. 78, McCord Second Supplemental Responses to United States First Request for Production (June 29, 2023), Nos. 15–18.a; 18.c; 19–23.

[158]    *Id.*, Nos. 15–18.a; 18.c; 19–23.; Ex. 5, Leistra-Jones Report, ¶¶ 42, 44–45.

[159]    *E.g.*, Ex. 5, Leistra-Jones Report, ¶¶ 48–49.

the work he performed at the Farmington Plant.[160] When companies act as distinct entities, their employees should not perform work for, or on behalf of, the other company without some kind of written contract outlining that work.[161] McCord Maine's (and Ex-Cell-O's) failure to document Birch's environmental management and compliance services for Davidson Rubber demonstrates a violation of corporate norms between Davidson Rubber and its parents.

Birch acknowledged that he oversaw and managed operations at the Farmington Plant related to the leakage or disposal of hazardous waste, and decisions about environmental compliance.[162] *See Bestfoods*, 524 U.S. at 66–67. There is no evidence that Birch's services were ever documented in a managerial services or secondment agreement, as would be expected if McCord Maine were respecting corporate norms. Thus, Birch's involvement went far beyond regular investor activities on behalf of McCord Maine by managing: (1) efforts to control wastewater at the Plant; (2) environmental compliance efforts at the Plant under the Clean Water Act; and (3) the expansion of the Plant building and septic system linked to waste disposal. Birch's actions were all the more striking given the lack of any documentation accounting for the services that Birch provided to Davidson Rubber on behalf of McCord Maine, and later, Ex-Cell-O. Birch acted as an "agent of the parent alone" through actions that are sufficiently "eccentric under accepted norms of parental oversight of a subsidiary's facility" to incur CERCLA liability for McCord. *Bestfoods*, 524 U.S. at 72. Consequently, McCord Maine and Ex-Cell-O operated the Farmington Plant, and Defendant is liable as the successor to both entities.

---

[160]    *Id.*, ¶¶ 44–45, 68, 77. The same is true for Filipiak and Vashak. *See id.* at ¶ 101.

[161]    *Id.*, ¶ 40.

[162]    Ex. 19, Birch Depo. Vol. VI, pp. 901–03, 919:12–18, EPA-SEMS_0045362 at 45444–46, 45463; Ex. 16, Birch Depo. Vol. I, pp. 61–63, 77:17–23, EPA-SEMS_0044866 at 44927–29, 44943; Ex. 65, Birch Depo. Vol. II, pp. 281–84, EPA-SEMS_0045036 at 45151–54.

C.      *Ex-Cell-O Violated Corporate Norms.*

During Ex-Cell-O's ownership of Defendant and Davidson Rubber between 1978 and 1988, Ex-Cell-O regularly failed to observe corporate norms regarding Davidson Rubber and the Farmington Plant. *See Sterling Centrecorp*, 960 F. Supp. 2d at 1048–49 (considering the "totality of circumstances" when determining whether a parent corporation is directly liable at a facility) (citing *Bestfoods*, 524 U.S. at 71; *Kayser-Roth*, 272 F.3d 89, *Newmont USA*, 2008 WL 4621566; *Basic Mgmt.*, 569 F. Supp. 2d at 1116). As the admitted successor to Ex-Cell-O,[163] Defendant is liable for Ex-Cell-O's operation of the Farmington Plant.

As discussed further below, Ex-Cell-O managed Davidson Rubber as an internal division, rather than a subsidiary, which in and of itself violated corporate norms, specifically the norm of maintaining separate identities. *See* Ex. 5, Leistra-Jones Report ¶¶ 34, 102. In maintaining separate identities, relevant, recognized norms include clearly representing one's corporate identity to outside parties, and holding and recording separate formal meetings. *Sterling Centrecorp*, 960 F. Supp. 2d at 1051. Ex-Cell-O failed both to observe both norms by failing to maintain an identity separate from Davidson Rubber.

Permit applications submitted to government agencies, including Plaintiffs, identified Ex-Cell-O as the operator and owner of the Farmington Plant.[164] In its annual reports, Board of

---

[163]      Ex. 2, McCord Response to Requests for Admission Nos. 17–19.

[164]      In 1980 and 1982, Ex-Cell-O was listed as the facility owner and operator of the Farmington Plant on the facility's RCRA permit applications. Davidson Rubber's Vice President of Operations signed the following certification on the applications:

> I certify under penalty of law that I have personally examined and am familiar with the information submitted in this application and all attachments and that based on my inquiry of those persons immediately responsible for obtaining the information contained in this application, I believe that the information is true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment.

Director materials, and correspondence, Ex-Cell-O described Davidson Rubber as its division, instead of a subsidiary.[165] *See id.* at 1047–48, 1051 (parent deviated from corporate norms in use of parent letterhead in communications on subsidiary's behalf). Davidson Rubber employees testified that they understood that Davidson Rubber was a division, not a subsidiary, of Ex-Cell-O—including the witness designated by Ex-Cell-O, McCord, and Davidson Rubber to testify on their behalf under Rule 30(b)(6) of the Federal Rules of Civil Procedure.[166] Statements pronouncing Davidson Rubber as a division of Ex-Cell-O are inconsistent with the norm of "clear representation of corporate identity in communications with outside parties." *Id.* at 1051.

Additionally, Defendant failed to produce any documents demonstrating that Davidson Rubber's Board of Directors ever met, operated the company independently, or even existed during Ex-Cell-O's period of ownership.[167] A company with a distinct identity should have its Board meet to appoint officers and take other actions as needed to govern the company.[168] *See also id.* (recognizing the norm of regular corporate meetings and record maintenance). The apparent non-existence of Davidson Rubber's Board of Directors demonstrates a failure to meet and maintain records and the failure to respect Davidson Rubber's independent existence.[169]

---

Ex. 58, EPA-SEMS_0045759 at 45762; Ex. 56, EPA-SEMS_0057481 at 57483–57489; *see also* Ex. 14, McCord § 104(e) Response, EPA-SEMS_0044321 at 44750–68; Ex. 5, Leistra-Jones Report, ¶ 80.

[165]    Ex. 5, Leistra-Jones Report, ¶¶ 72–79.

[166]    *Id.*, ¶ 81; Ex. 10, Williams Depo. Vol. I, pp. 7–8, 14, 24, EPA-SEMS_0069176 at 69182–83, 69189, 69199; *see also* Ex. 79, Ferrari Depo. pp. 13–14, EPA-SEMS_0046039 at 46052–53.

[167]    *See* Ex. 5, Leistra-Jones Report, ¶¶ 44–45, 77–78. The only document that Defendant provided demonstrating activity by Davidson Rubber's Board of Directors was dated July 31, 1964. *Id.*, ¶¶ 44.b, 77.

[168]    *Id.*, ¶ 77.

[169]    *Id.*, ¶ 102.

Ex-Cell-O's appropriation request procedures further eroded corporate norms regarding Davidson Rubber and the Farmington Plant. Ex-Cell-O's approval authority (including Birch's specific signature) was needed for expenditures as low as $77,500, when Davidson Rubber sought $77,500 and $48,000 for groundwater studies at the Farmington Plant in 1984.[170] $48,000 and $77,500 in 1984 were equivalent to $144,000 and $232,000 in September 2023. Parent companies usually do not need to approve requests below $500,000 (in 2023 dollars).[171] Ex-Cell-O similarly approved Davidson Rubber's expenditures for $96,000 to close the Farmington Plant lagoons in 1986, and $120,000 in 1985 to provide municipal water services for nearby residents whose wells had been contaminated from a landfill where Davidson Rubber disposed of Plant waste.[172] Not only did Ex-Cell-O directly control Davidson Rubber's environmental compliance efforts at the Farmington Plant by approving these expenditures, but these relatively modest amounts demonstrated Ex-Cell-O's high level of control over Davidson Rubber's environmental operations.[173] Both externally—via permit applications, annual reports, and correspondence— and internally—through correspondence and tight restrictions on Davidson Rubber's appropriations for environmental compliance—Ex-Cell-O violated the norm of respecting separate identities between itself and Davidson Rubber, and exercised decision making authority regarding environmental compliance at the Farmington Plant.

---

[170]    *Id.*, ¶¶ 85–86.

[171]    *Id.*, ¶ 87. Mr. Leistra-Jones used the U.S. Department of Labor's Inflation Calculator, available at https://data.bls.gov/cgi-bin/cpicalc.pl.

[172]    Ex. 5, Leistra-Jones Report, ¶¶ 86, 89.

[173]    *See id.*, ¶ 86.

III.    **Defendant Treated Davidson Rubber as a Division and Thus Operated the Farmington Plant.**

Alternatively, the Court may find Defendant liable without determining direct operator liability under *Bestfoods* or indirect liability through veil piercing. Both McCord Maine and Ex-Cell-O treated and publicly held out Davidson Rubber as a division, instead of a subsidiary. Unlike a subsidiary, a division is not separate from the corporation itself; a division's liabilities are the corporation's liabilities. *See Kleen Laundry*, 867 F. Supp. At 1143 (citing *Atl. Richfield Co. v. Blosenski*, 847 F. Supp. 1261, 1292 (E.D. Pa. 1994)).[174] If Davidson Rubber functioned as an internal division of McCord Maine or Ex-Cell-O, rather than a separate legal entity, then Davidson Rubber's CERCLA liability arising from operation of the Farmington Plant was McCord Maine and Ex-Cell-O's CERCLA liability, and no further analysis of employee actions or corporate norms is required. Therefore, Defendant can be held liable as an operator of the Farmington Plant for treating Davidson Rubber as a division of McCord Maine or Ex-Cell-O.

Congress enacted CERCLA to both provide for prompt responses to an increasing number of sites contaminated with hazardous waste and to impose the cleanup costs on the parties responsible for the pollution. *E.g.*, *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir. 1986) (*Dedham Water Co. I*) (citing *United States v. Reilly Tar & Chem. Corp.*, 546 F. Supp. 1100, 1112 (D. Minn. 1982)). Thus, given the remedial nature of CERCLA, courts in the First Circuit "construe its provisions liberally to avoid" frustrating the statute's goals. *United States v. Kayser-Roth Corp., Inc.*, 910 F.2d 24, 26 (1st Cir. 1990) (citing *Dedham Water Co. I*, 805 F.2d at 1081). In the specific context of disregarding corporate formalities, this Court emphasized the importance of prioritizing CERCLA's remedial goal:

---

[174]    *See also id.*, ¶ 36.

42

> This goal would be frustrated if the mere act of incorporation were allowed to impede the recovery of response costs, for a nonincorporated violator could avoid liability simply by changing company structure. Furthermore, the absence of explicit statutory language addressing the effect of incorporation, the Act's strict liability scheme, and the broad and encompassing categories of potentially responsible parties ineluctably lead the Court to the conclusion that CERCLA places no importance on the corporate form.

*Mottolo*, 695 F. Supp. at 624; *see also Kleen Laundry & Dry Cleaning Servs., Inc. v. Total Waste Mgmt. Corp.*, 817 F. Supp. 225, 231 (D.N.H. 1993) ("Congressional intent supports the conclusion that, when choosing between the taxpayers or a successor corporation, the successor should bear the cost."). Thus, as the First Circuit and this Court have long understood, corporate entities that benefited from pollution-causing activities should not avoid paying for remediation through corporate reorganizations.

Similarly, under traditional veil-piercing inquiries, which Plaintiffs do not ask the Court to undertake, courts in this Circuit have been reluctant to recognize corporate formalities if doing so would undermine the federal statute at issue. *E.g.*, *United States v. JG-24, Inc.*, 331 F. Supp. 2d 14, 63 (D.P.R. 2004) ("The general rule is that a corporate entity may be disregarded in the interests of public convenience, fairness, and equity.") (citing *Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 26 (1st Cir. 2000)); *see also United Elec., Radio & Mach. Workers of America v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1092 (1st Cir. 1992) ("[A] federal court, in deciding what veil-piercing test to apply, should 'look closely at the purpose of the federal statute to determine whether the statute places importance on the corporate form, an inquiry that usually gives less respect to the corporate form than does the strict common law alter ego doctrine.'" *Town of Brookline v. Gorsuch*, 667 F.2d 215, 221 (1st Cir. 1981) (citations omitted). New Hampshire state courts take a similar approach. *See Bielagus v. EMRE of New Hampshire Corp.*, 826 A.2d 559, 567 (N.H. 2003) ("[W]e have never hesitated to disregard

corporate fiction when it appears that the shareholders may have committed a fraud <u>or that the circumstances will lead to an inequitable result</u>.") (emphasis added).

Here, although Davidson Rubber was separately incorporated, McCord Maine and Ex-Cell-O treated it as an internal division.[175] Davidson Rubber's corporate letterhead in the 1970s and 1980s routinely described it as a "Division of McCord"[176] and "Division of Ex-Cell-O."[177] *Cf. Sterling Centrecorp*, 960 F. Supp. 2d at 1047–48, 1051. Notably, the deferred 1973 appropriations request seeking approval for $12,000 to conduct an engineering study for wastewater treatment at the Farmington Plant was on letterhead describing Davidson Rubber as a "Division of McCord," as was the 1974 appropriations request for the wastewater treatment facility that was ultimately approved.[178]

Davidson Rubber employees understood that it was part of McCord Maine and later Ex-Cell-O. In *Fireman's Fund*, Davidson Rubber employees testified that Davidson Rubber was a division of McCord Maine and later Ex-Cell-O.[179] Birch also testified that in 1971 or 1972, "Farmington was part of McCord."[180] Not only did Davidson Rubber employees think it was a division of McCord Maine and Ex-Cell-O, even Ex-Cell-O's Board of Directors' meeting minutes regularly referred to Davidson Rubber as a division.[181] The absence of <u>any</u> records

---

[175]    *Id.*, ¶¶ 70–83.

[176]    *E.g.*, Ex. 32, EPA-SEMS_0002016; Ex. 35, EPA-SEMS_0027968.

[177]    *E.g.*, Ex. 56, EPA-SEMS_0057481; Ex. 57, EPA-SEMS_0002586; Ex. 5, Leistra-Jones Report, ¶ 79.

[178]    Ex. 31, EPA-SEMS_0027738 at 27749; Ex. 44, EPA-SEMS_0027953.

[179]    *See supra* note 166.

[180]    Ex. 19, Birch Vol. VI p. 905:10–24, EPA-SEMS_0045362 at 45448.

[181]    *E.g.*, Ex. 80, McCord0026473 at 26474; Ex. 81, McCord0026488 at 26491; Ex. 82, McCord0027745 at 27747; Ex. 83, McCord0028276; Ex. 84, McCord0026872 at 26873; Ex. 85, McCord0028315; Ex. 86, McCord0028319; Ex. 5, Leistra-Jones Report, ¶ 76.

showing activity by Davidson Rubber's own Board of Directors, or even the existence of Davidson Rubber's Board of Directors, during this time further suggests that Davidson Rubber did not in practice operate as a separate entity, but instead functioned as a division of McCord Maine and then Ex-Cell-O.[182] *See Sterling Centrecorp*, 960 F. Supp. 2d at 1051.

McCord Maine and Ex-Cell-O also publicly held out Davidson Rubber as a division. Permit applications under both federal and state environmental laws identified Ex-Cell-O as the operator and legal owner of the Farmington Plant.[183] Effluent monitoring results required by the Farmington Plant's Clean Water Act permit were sent to EPA on letterhead describing Davidson Rubber as a division of McCord (Maine).[184] Ex-Cell-O's corporate shareholder reports consistently described Davidson Rubber as a division.[185] Further, EPA and the State generally recognized Davidson Rubber as a division of Ex-Cell-O.[186]

Although documentation demonstrates that Davidson Rubber was formally incorporated as a subsidiary of McCord Maine and Ex-Cell-O, McCord Maine and Ex-Cell-O consistently blurred the lines between themselves and Davidson Rubber as it suited them, frequently holding Davidson Rubber out as a division of themselves, as opposed to a truly independent subsidiary.[187] To now uphold the corporate distinctions that McCord Maine, Ex-Cell-O, and Davidson Rubber themselves failed to respect at the time of the releases of hazardous substances, would shift the burden of remediation costs away from a viable potentially responsible party and

---

[182]    *See supra* note 167.

[183]    *See supra* note 164.

[184]    *See supra* note 51.

[185]    Ex. 5, Leistra-Jones Report ¶¶ 72–74.

[186]    *See id.*, ¶¶ 80, 82.

[187]    *Id.*, ¶ 83.

onto the taxpayers.[188] Such a result would be both inequitable and antithetical to CERCLA's goal of making the polluters pay for cleanup. *See, e.g.*, *Mottolo*, 695 F. Supp. at 624 ("This goal would be frustrated if the mere act of incorporation were allowed to impede the recovery of response costs . . ."). Longstanding First Circuit precedent disregards corporate formalities to avoid frustrating the principles of CERCLA. Thus, Defendant should not now be able to evade liability by relying on corporate distinctions it historically failed to respect.

### IV.    Defendant's Liability Was Not Discharged by Collins & Aikman's Bankruptcy.

Finally, Defendant claims its liability was discharged by the Collins & Aikman's bankruptcy proceedings. A party asserting an affirmative defense must do more than provide fair notice of the defense; it must "point to competent evidence showing the existence of a genuinely disputed material fact." *Doiron v. Brown*, Case No. 21-cv-360-SM, 2023 WL 3456884, at *2 (D.N.H. May 15, 2023). The settlements executed in the Collins & Aikman bankruptcy proceeding only provided relief to Collins & Aikman and its subsidiaries. And Defendant has failed to produce any evidence to support this affirmative defense.

In 1987, Davidson Rubber was renamed Davidson Textron, Inc., which was later renamed Textron Automotive Interiors, Inc., in 1995.[189] In 2001, Collins & Aikman Products Co. (Collins & Aikman) purchased Textron Automotive Interiors, Inc. (formerly Davidson Rubber), which was later renamed Collins & Aikman Automotive Interiors, Inc.[190] In 2005, Collins & Aikman filed Chapter 11 bankruptcy for itself and its subsidiaries, including Collins & Aikman Automotive Interiors, Inc. (formerly Davidson Rubber). In re: Collins & Aikman Corp.,

---

[188]    Davidson Rubber was dissolved as part of the Collins & Aikman bankruptcy proceedings. *See* Ex. 77, July 18, 2007 Order ¶ 14, EPA-SEMS_0020784 at 20808–09.

[189]    Answer ¶ 50, ECF No. 21.

[190]    Answer ¶ 51.

U.S. Bankr. Ct., E.D. Mich., Case No. 05-55927. Thus, there was no corporate relationship between Defendant and Collins & Aikman or Davidson Rubber when Collins & Aikman filed for bankruptcy.

The Bankruptcy Court for the Eastern District of Michigan approved the First Amended Joint Plan of Collins & Aikman Corp. and its Debtor Subsidiaries on July 9, 2007 (July 9, 2007 Plan).[191] Although Article XII.E of the July 9, 2007 Plan enjoins any person from seeking to recover a claim, debt, or liability against the Debtors after the Effective Date, nothing in Article XII mentions Defendant, much less releases it from liability to Plaintiffs.[192]

The United States and NHDES entered into a separate settlement agreement with the Debtors regarding the Farmington Plant, which was approved on July 18, 2007 (July 18, 2007 Order).[193] Under that July 18, 2007 Order, the bankrupt Debtor transferred title of the Farmington Plant property to the Trust, and the United States and NHDES agreed not to seek injunctive relief or otherwise pursue the Debtor or the Post-Consummation Trust for cleanup of the Farmington Plant.[194] Additionally, the July 18, 2007 Order expressly reserved the rights of the United States and New Hampshire to pursue "non-Debtors" for environmental claims related

---

[191]    Ex. 87, First Amended Joint Plan of Collins & Aikman Corp. and its Debtor Subsidiaries, July 9, 2007, In re: Collins & Aikman Corp., Case No. 05-55927, ECF No. 7731 (July 9, 2007 Plan).

[192]    *Id.*, § XII.

[196]    Ex. 77, July 18, 2007 Order, EPA-SEMS_0020784.

[194]    *Id.*, ¶¶ 73, 75, 79, 83, EPA-SEMS_0020784 at 20829–30. The Post-Consummation Trust was created to liquidate the Debtors' assets and was unrelated to the Trust, which was created to take title to the Farmington Plant and other properties for remediation purposes. *Compare* Ex. 87, July 9, 2007 Plan § VIII.B *with* Ex. 77, July 18, 2007 Order ¶¶ 72–73, 75, EPA-SEMS_0020784 at 20829, *and* Ex. 88, Custodial Trust Agreement § 2.2, EPA-SEMS_0020756 at 20758.

to the Farmington Plant.[195]

The plain terms of both the July 9, 2007 Plan and the July 18, 2007 Order relieved only the Collins & Aikman Debtors. Neither document offered relief to Defendant, which admits that it was neither a debtor nor debtor in possession in the Collins & Aikman bankruptcy proceeding.[196] Moreover, Defendant does not explain how this defense falls within the three narrow statutory exceptions to federal or state environmental liability. 42 U.S.C. § 9607(b) (exempting from liability releases caused <u>solely</u> by an act of God, an act of war, or an act or omission of a third party); N.H. RSA 147-B:10-a, I (providing same exceptions as CERCLA). *See*, *e.g.*, *Acushnet Co. v. Mohasco Corp.*, 191 F.3d 69, 74 (1st Cir. 1999). Defendant has failed to provide any evidence to support its defense or that undermines Plaintiffs' position. Based on the foregoing, there are no genuinely disputed material facts, and Plaintiffs are entitled to partial summary judgment as a matter of law.

## CONCLUSION

The *Fireman's Fund* court found that disposal of hazardous substances occurred at the Farmington Plant. McCord Maine and Ex-Cell-O operated the Farmington Plant through the actions of Richard Birch and other employees, and by treating Davidson Rubber as a division. Defendant is the successor to both McCord Maine and Ex-Cell-O and is therefore liable as the successor to these Farmington Plant operators. 42 U.S.C. § 9607(a)(2); N.H. RSA 147-B:10, I(b). Further, the bankruptcy proceedings of Collins & Aikman did not relieve Defendant of liability. Therefore, the Court should find Defendant liable for the Plaintiffs' response costs to

---

[195]    Ex. 77, July 18, 2007 Order, ¶¶ 86–89, EPA-SEMS_0020784 at 20834–35.

[196]    Ex. 89, McCord Responses to Second Set of Requests for Admission No. 20.

avoid frustrating CERCLA's remedial goals and to ensure that the successor party pays rather than the taxpaying public.

Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division

/s/ Natalie G. Harrison
NATALIE G. HARRISON
FL Bar No. 0111525
ALISON KELLY
FL Bar No. 0016660
Trial Attorneys
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Ben Franklin Station P.O. Box 7611
Washington D.C. 20044-7611
(202) 305-0461(Harrison)
(202) 514-1210 (Kelly)
Natalie.G.Harrison@usdoj.gov
Alison.Kelly@usdoj.gov

STATE OF NEW HAMPSHIRE
DEPARTMENT OF ENVIRONMENTAL
SERVICES

By and through its attorney,

JOHN M. FORMELLA
ATTORNEY GENERAL

/s/ Joshua C. Harrison
Joshua C. Harrison, Bar #269564
Assistant Attorney General
Environmental Protection Bureau
Office of the Attorney General
New Hampshire Department of Justice
1 Granite Place South
Concord, New Hampshire 03301
(603) 271-3679
Joshua.C.Harrison@doj.nh.gov

Of counsel:

John Hultgren, Esq.
Office of Regional Counsel
U.S. Environmental Protection Agency Region 1
5 Post Office Square - Suite 100 (4-WI)
Boston, MA 02109-3912