UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

United States of America,
and State of New Hampshire
Department of Environmental Services,
        Plaintiffs

        v.                                    Case No. 22-cv-0289-SM-AJ
                                              Opinion No. 2025 DNH 044
McCord Corporation,
        Defendant

**O R D E R**

In September, 2022, Plaintiffs, the United States of
America, acting on behalf of the Regional Administrator of the
United States Environmental Protection Agency ("EPA") for Region
1, and the State of New Hampshire, Department of Environmental
Services, filed a consolidated action against the McCord
Corporation pursuant to Section 107 of the Comprehensive
Environmental Response, Compensation, and Liability Act
(CERCLA), 42 U.S.C. § 9607, and New Hampshire law, N.H. Rev.
Stat. Ann. 147-A and 147-B.  Plaintiffs contend that McCord is
liable for environmental cleanup costs associated with Davidson
Rubber's automobile parts manufacturing plant in Farmington, New
Hampshire, (the "Plant") now known as the Collins and Aikman
Plant (Former) Superfund Site (the "Site").

From the 1960s through the 1980s, operators of the Plant discharged wastewater into the surrounding area, contaminating the groundwater with volatile organic compounds.  Wastewater from the Plant was first discharged directly into a tributary of a nearby brook, and later discharged directly into the ground on the north side of the Plant, and finally, discharged into the groundwater through lagoons constructed by the Plant's operators.

Costs associated with environmental remediation of the Site are significant.  Plaintiffs contend that defendant is liable for those costs as a former operator of the Plant.  Defendant disagrees.  Both parties have filed cross-motions for summary judgment as to liability, asserting that there are no genuinely disputed facts, and claiming entitlement to judgment as a matter of law.

### Standard of Review

"Summary judgment is appropriate only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  Gattineri v. Wynn MA, LLC, 93 F.4th 505, 509 (1st Cir. 2024) (quoting Fed. R. Civ. P. 56(a)).  A genuine factual dispute exists if "the evidence is such that a reasonable jury could resolve the point in the favor of the non-moving party," and a material fact is one "that has

2

the potential of affecting the outcome of the case." Hamdallah
v. CPC Carolina PR, LLC, 91 F.4th 1, 16 (1st Cir. 2024)
(internal quotation marks omitted).  To decide a summary
judgment motion, the court draws all reasonable inferences in
favor of the nonmoving party from the properly supported facts
in the record.  Lech v. von Goeler, 92 F.4th 56, 64 (1st Cir.
2024).

Cross motions for summary judgment are reviewed under the
same standard but separately, drawing reasonable inferences in
favor of the non-moving party in turn.  Jespersen v. Colony Ins.
Co., 96 F.4th 481, 487 (1st Cir. Mar. 25, 2024).  When a
plaintiff moves for summary judgment on her own claims, to
succeed, she must provide conclusive evidence that shows "no
reasonable fact-finder could find other than in [her] favor."
Scottsdale Ins. Co. v. Torres, 561 F.3d 74, 77 (1st Cir. 2009);
see also In re Buscone, 61 F.4th 10, 27-28 (1st Cir. 2023);
Asociacion de Suscripcion Conjunta del Seguro de Responsabilidad
Obligatorio v. Juarbe-Jimenez, 656 F.3d 42, 50 n.10 (1st Cir.
2011); Brookline Opportunities, LLC v. Town of Brookline, 682 F.
Supp. 3d 168, 178 (D.N.H. 2023).

### Factual Background

The period relevant to the parties' dispute extends from
1964 through 1986, during which McCord Maine and Ex-Cell-O were

the corporate parents of Davidson Rubber.  Much of the current factual record is sourced from evidence produced during insurance coverage litigation between Ex-Cell-O, McCord, and Davidson, and its insurers (including the Fireman's Fund Insurance Companies), in the late 1980s and early 1990s (the "Fireman's Fund litigation" or "Fireman's Fund").  In that case, Ex-Cell-O, McCord, and Davidson asserted claims for environmental liability insurance coverage for twenty-two different sites nationwide, including the Farmington Site.  With respect to the Farmington Site, the companies argued, employing policy terms, that the pollution was a result of two "sudden and accidental" "spills of perchlorethylene, one at a storage tank in 1977 and the other from a pipe rupture in 1978."  Fireman's Fund Ins. Companies v. Ex-Cell-O Corp., 750 F. Supp. 1340, 1348 (E.D. Mich. 1990).  They contended that those "incidents fulfill[ed] the 'occurrences' requirement under the policies." Id.  The district court disagreed, concluding that the companies had not "proved an occurrence resulting in property damage at the Farmington site within the relevant policy periods," but, even if they had proven it, the policyholders could not prevail "because they expected the resulting damage."  Id.

**The Corporate Entities**

Before delving into the relevant factual background, a brief overview of defendant's corporate history is helpful.  In 1923, McCord Radiator & Mfg. Co. was incorporated in Maine ("McCord Maine").  The company changed its name to the McCord Corporation in 1944.  In 1964, McCord Maine entered into a Plan and Agreement of Reorganization with the Davidson Rubber Company, Inc. ("Davidson"), a New Hampshire corporation that owned and operated auto parts manufacturing facilities within the state.  Pursuant to the agreement between McCord Maine and Davidson Rubber, McCord Maine purchased substantially all the assets of Davidson Rubber and assumed substantially all its liabilities.  Following McCord Maine's acquisition, in 1965, Davidson purchased approximately 81-acres of land in Farmington to construct the Plant.

Davidson remained a McCord Maine subsidiary from 1964 through 1978.  On January 27, 1978, Ex-Cell-O Corporation ("Ex-Cell-O"), a Michigan corporation; XLO, Inc. (a wholly owned subsidiary of Ex-Cell-O); and McCord Maine entered into an Agreement and Plan of Merger for the acquisition of McCord Maine.  Pursuant to that acquisition, McCord Maine merged with and into XLO, Inc., which became the surviving entity and successor to McCord Maine.  XLO, Inc., changed its name to the

"McCord Corporation" (and is the same McCord Corporation named as defendant in the current action).  Ex-Cell-O was McCord's direct parent and sole owner, while McCord was Davidson Rubber's direct parent and sole owner.

In 1986, Textron, Inc. acquired Ex-Cell-O and Ex-Cell-O's portfolio, including Davidson, in a transaction characterized as a merger by Ex-Cell-O's Board of Directors.  Ex-Cell-O was liquidated, and its shares of McCord were transferred to TX Financing Corp. 12.  McCord continued to own all shares of Davidson.  In 1991, TX Financing Corp. 12 merged into McCord, currently headquartered in Troy, Michigan.

Finally, McCord concedes that it is Ex-Cell-O's successor.

### The Farmington Plant and McCord Maine

The Farmington Plant began manufacturing automobile parts in 1966.  At that time, effluent from the Plant's operations drained into a culvert at the parking lot located at the southern end of the Plant.  The culvert discharged into an unnamed wetland tributary which drained to the Pokamoonshine Brook.  Discharge from the Plant's wash and process lines traveled from the Plant's interior floor drains to the parking lot culvert, while noncontact cooling water from the Plant was

discharged directly into the Brook.[1]  Finally, because the Plant

was not connected to a municipal sewer, sewage wastewater was

either disposed into a septic tank or discharged directly into

the ground.  By July, 1971, a contractor estimated that the flow

of effluent from the Plant averaged approximately 60,000 gallons

each day.

In support of their motions for summary judgment, both

parties focus on the role played by Richard Birch with respect

to the Plant's operations and its wastewater management.  Birch

was hired by Davidson Rubber in 1964 to work at its facility in

Dover, New Hampshire.  He was deeply involved in construction of

---

[1]    Richard Birch, who served as defendant's Facilities Manager
and Safety Director and later its Director of Energy and
Environmental Affairs, testified:

> We used to monitor the Pokomoonshine Brook because it
> was a trout stream, and the native people up there
> would always be coming up to us and telling us about
> the fish they had caught in the Pokomoonshine Brook.
> And I always thought it was funny because most of the
> year you could pour a cup of coffee into the brook and
> make more liquid than there was water.· It was very
> close to being an occasional stream, which if it were,
> it would draw trout, obviously.·
>
> But we used to, in the early days, put noncontact
> cooling water into it, and we used to watch very
> carefully to see that we didn't do anything that made
> an obvious spill there because [the Brook] was
> something that attracted local attention.

Pls.' Mot. for Summary Judgment, Exh. 16 ("Pls.' Exh.") at 89:1-
14.

the original Farmington Plant, and, in that capacity, reviewed drawings that were prepared by the project's engineer that related to the Plant's sanitary waste disposal and drainage systems.

In 1967, Birch began working for McCord Maine, and he relocated to Detroit, Michigan.  He was promoted to McCord Maine's Manager for Safety and Ecology in 1971.  In that capacity, Birch was charged with inspecting McCord Maine's manufacturing plants and assisting facility compliance with the newly passed Occupational Health and Safety Act ("OSHA").  McCord Maine described Birch's role in its 1971 shareholder report:

> Mindful of its responsibilities to protect the natural
> environment and help improve the communities where it
> operates plants, McCord expanded its corporate
> citizenship role this year.  An experienced McCord
> engineer was appointed to a newly created position of
> manager of safety and ecology.  In addition to his
> safety responsibilities, he is working with divisions
> on ways to reduce or eliminate any air, water, or
> noise pollution that McCord manufacturing plants may
> generate.

Pls.' Exh. 17, at 62513.  Over the next several years, Birch's role gradually morphed to become the company's Facilities Manager and Safety Director.

In the summer of 1970, employees at the Plant began noticing discoloration and an odor in their water supply.

Davidson began taking water samples in the Plant to determine the source of the contamination.  Initial efforts to remedy the situation were ineffective, and by mid-July, those water issues had worsened.  At that point, responding to a recommendation from New Hampshire's pollution control division, Davidson began treating both the Plant's water reservoir and well with chlorine.

About that same time, the Plant engaged William Fletcher, P.E., of Environmental Engineering Incorporated ("EEI") to investigate the problem.  EEI performed several on-site investigations, collected and analyzed water samples from several different locations at the Site and nearby areas, and issued an October 12, 1970, report to Davidson.  After meeting with EEI in early November, the Company implemented a program to regularly test water from various locations around the Site, treat the Plant's cooling water and drains with chlorine, and monitor effluents into the Plant's drainage system.

In January, 1971, Davidson again retained EEI to analyze Farmington's wastewater discharges on the southern end of the plant, and to install a weir at the end of the drainage system. By May, 1971, Robert Hynes, at that time Davidson's Director of Personnel (and viewed by some Davidson employees as the "overseer" of the Plant's environmental issues), Def.'s Mot. for

9

Summary Judgment, Ex. ("Def.'s Exh.") 14 at 57:8-14[2]) was concerned that the Plant's "community relations were coming into question relative" to the Plant's wastewater effluent and the Brook.  Pls.' Exh. 97 at p. 32.  Hynes developed an action plan, pursuant to which the Plant would: (1) request that state regulators audit the Plant's wastewater, (2) sample the water in the Brook, and (3) meet with EEI to review the results of their study and evaluate Plant wastewater treatment options.  EEI eventually reported back in early July, proposing that the Plant use a chlorine treatment system to address wastewater issues.

Davidson employees met again with EEI in September, 1971, when water sampling at the Site revealed increased bacteria counts.  EEI recommended chlorination of the drainage system, that the Plant remove a weir that was causing ponding, and the elimination of garbage from the Plant's dumpster area.  The Plant's Utility Engineer, Joe McCormack, reached out to another

---

[2]    There is evidence in the record that Hynes did not share that view.  He testified at deposition that he saw his role as "community relations," pls.' exh. 97 at p. 103; was not aware that the well supplying drinking water for the Plant drew from groundwater associated with the Brook, id. at p. 40; did not know when (or if) the Plant began treating its effluents, id. at p. 37; did not know who was responsible for environmental permitting applications in 1974 (although hypothesized it could be "Dick Birch"); id. at 120; and did not participate in the decision-making process that led to selection of the lagoon system for handling effluent, def.'s opp. to pls.' mot. for summary judgment, exh. ("def.s' opp. exh.") 1 at p. 140.

consultant, Dr. George Bierman, of H.V. Shuster, Inc.  Dr.
Bierman analyzed the Site's water testing data in September,
1971.  He also recommended that the Plant's drainage system be
treated with chlorine, and the Plant's drainage lines flushed.
Consistent with those recommendations, Davidson treated their
water drainage system with chlorine, removed the weir causing
ponding, and installed a solid manhole cover in the dumpster
area.

The record does not reveal exactly when Birch was first
looped in on the Plant's wastewater issues.[3]  But, he was copied
on the Plant's discharge application that McCormack filed with
the Army Corps of Engineers in October, 1971.  Pls.' Exh. 22.

---

[3]  On his involvement during this time, Birch testified:

> Q. Can you tell me what your position was in 1971 and
> 1972 so that you attended a meeting with respect to
> water pollution problems and are cc-d on memos with
> regard to that subject?
>
> A. I was safety director of McCord at that time.
>
> Q. And what was your connection to the Farmington
> plant at that time?
>
> A. Well, McCord was -- Farmington was part of McCord.

Pls.' Exh. 19 at 905:10-24.·

And, in November, 1971, Birch sent a memo to Edward Veale, who was, at the time, the manager of the Farmington Plant.  In his memo, Birch noted that he had reviewed "Joe McCormack's collection of data," and identified several specific issues relating to bacteria counts in the Plant's wastewater effluent. Pls.' Exh. 23.  Birch was concerned that bacterial counts were "steadily increasing," and were higher than readings from the previous year.  He concluded that the cause was poor housekeeping, and directed certain actions be taken on a "crash basis" to address the issue.  Id.

Specifically, Birch directed that the Plant should: (1) relocate its dumpsters, and direct cafeteria waste to those dumpsters; (2) clean out a drain line; (2) move the trash compactor to the shipping area; (4) clean the area surrounding the trash compactor more frequently; and (5) install a hose bib, and wash the area around the dumpster with hypochlorite.  Hynes thought that Birch's "analysis and proposal [made] sense," and recommended that the Plant take action immediately "to develop an approach to the R. Birch proposal."  Def.'s Exh. 16 at 47487. The Plant implemented four of the five action items Birch had recommended (moving the trash compactor was not feasible).

Birch visited the Plant a few weeks later, in December, 1971.  On December 10, 1971, he met with McCormack, Hynes, Larry

Lambert, Davidson's Industrial Relations Manager, and Bert Allen, whose title the record does not disclose, so that they could "develop a long-term solution to the water pollution problem at the Farmington Plant."  Pls.' Exh. 26.  During the meeting, attendees agreed that "from a legal and community relations standpoint," it was necessary to "develop a facility that treats all water which passes through the Davidson Water System and leaves the property via the culvert at the end of the plant parking lot."  Pls.' Exh. 26.

Birch proposed construction of a surface-aerated lagoon between the Plant's parking lot and the Brook, which would retain and aerate the effluent prior to discharge.  Id.  Other meeting attendees agreed "this appeared to be a feasible proposal," and Hynes suggested they ask EEI's Fletcher to study whether construction of a lagoon would remediate the Plant's effluent issue.  Id.  If so, the Plant would move forward by seeking Town and State officials' approval for the project.

Later that month, Davidson employees met with EEI to discuss the viability of the lagoon as a water treatment option.  EEI's recommendation differed slightly from Birch's, in that EEI proposed that the lagoon be aerated from the bottom, treated with chlorine, and the treated water then reused within the Plant.  EEI formally submitted their proposal for installation

of a "water re-use reservoir" in January, 1972, pls.' exh. 28, which Birch reviewed in February.  Pls.' Exh. 27.  Birch commented that the reservoir proposed by EEI would be adequate "as long as some provision is made to trap surface oils for periodic manual removal."  Id.  He wrote: "Visible oil films would negate all of our work[,] should they show up downstream, and oil and gas runoff from the parking lot and truck dock area is an ever present possibility."  Id.  Other Davidson employees raised similar concerns.  So, Hynes asked Lambert and McCormack to determine whether EEI's proposal would address surface oil removal and, if not, what would be required to add that capability.

During a January, 1972, meeting, however, Davidson employees determined that, because EEI's proposed system included a chlorination plant that would treat wastewater, a lagoon was not necessary.  Def.'s Opp. Exh. 41.  It is not clear from the record who attended the meeting, which McCormack summarized in a March, 1972, memo to Veale, besides McCormack and Veale.  Id.  In any event, EEI's cost estimates were revised, and Davidson prepared and submitted appropriation request forms to McCord Maine for a water treatment system that would hold wastewater in a "reinforced concrete chamber" while it was treated with chlorine.  Id.; Def.'s Exh. 23.

Yet, no treatment system was constructed.  The record does not disclose what happened with the March, 1972, appropriation request, but as of April, 1973, the Plant was still discharging chemically contaminated effluent into the Brook.  As a temporary solution, Davidson began to divert the effluent to the front (northern) roof drainage system, which drained directly onto the Site, but not directly into the Brook.

Diverting effluent to the Plant's northern end did little to improve matters.  In July, 1973, EEI completed an analysis of the discharged wastewater, and noted that nearly 14,0000 gallons of wastewater from the Plant's "washers, paint stripping, wash dumps and boiler blow down," which was "dirty grey in color and contains substantial quantities of paint solids and foam grindings," was being discharged on a daily basis from the Plant to the Site.  Pls.' Exh. 31.  EEI now proposed that the Company construct a water treatment facility to treat its effluent through PH adjustment with lime, chemical coagulation with alum, clarification-settling and sand filtration, estimating installation costs at around $50,000.  Def.'s Exh. 27.

Instead of initiating work on EEI's recommended water treatment facility, on August 10, 1973, McCormack sent a memo to John Cochrane, Davidson's chief engineer, that attached an appropriation request for $12,000 to cover EEI's consulting

fees, which included $8,000 for EEI's engineering work, as well as an additional $4,000 for EEI to evaluate underlined additional treatment systems.  The appropriation request was submitted by Veale on August 23, 1973, who requested its expedition, writing:

> Before [construction of the water treatment facility] can be justified[,]sufficient time and effort must be expended to develop the most economical plan . . . The problem, however, cannot be taken lightly.  We are presently discharging wastewater . . . onto our own land.  It does, however, finally flow onto adjacent land and continued flow of water in this area will expose us to environmental complaints.
>
> . . .
>
> It seems prudent then that we make the initial investment into the engineering and design study before appropriating funds for a final facility.

Pls.' Exh. 31.  On September 24, 1973, Cochrane echoed Veale's request for expediency, writing in a memo to Veale:

> I would appreciate anything that can be done to expedite this appropriation since our recent problem with water usage indicates that we are straining our water facilities and should have a comprehensive plan of both sewage and water usage before we proceed. . . .  Per his memo, [Birch] intends to visit us some time in the early fall, and I would like to have some definite program committed and under way.

Pls.' Exh. 30.  Despite the requests for expediency, the August, 1973, appropriation request went nowhere, deferred by McCord Maine "due to unexpected and unusual expenditures as a result of the energy crisis."  Pls.' Exh. 39.

About the same time, in July, 1973, Birch sent a memo (on McCord Maine intracompany letterhead) to every McCord Maine facility, including the Plant, regarding the new Federal Water Pollution Control Act of 1972 (the "Clean Water Act").  Birch recommended that each plant "start an aggressive water conservation program," and wrote that he planned to visit each plant to collect effluent samples for analysis.  Pls.' Exh. 30. He stated: "[t]he results of these analyses and your water conservation programs should enable us to determine pollution control process requirements and their associated capital costs for each location."  Id.  Birch volunteered his assistance to the plants "in any way possible in the development of water conservation programs."  Id.

During this time, Birch was also an active participant in Davidson's permitting endeavors.  As previously noted, Birch was copied on the Plant's 1971 application for a discharge permit with the Army Corps of Engineers.  And, in February, 1974, Birch joined Hynes for a conversation with Richard Cavagnero, a Sanitary Engineer for the United States Environmental Protection Agency ("EPA"), regarding effluent discharge limitations and sampling requirements for Davidson's CWA discharge permit. Birch was copied on monthly monitoring reports sent by Davidson to the EPA in 1974 and 1975.  The Plant's permitting programs

were directly overseen by McCormack, however, who prepared and submitted several permit applications on the Plant's behalf.

In the meantime, wastewater discharge at the Site continued, unabated. Davidson internal memos from this time characterized the discharge as "unsightly," "malodorous," and with the potential to "result in extremely adverse community reactions." Pls.' Exh. 39. In April, 1974, Birch visited the Plant and conducted a field inspection. He observed that discharge from the roof drains was creating "a foul waste with very poor visual characteristics, being milky in appearance and leaving any grass and shrubbery in its path blackened and dead." Pls.' Exh. 40. Birch hypothesized that, during rainy periods, that foul waste likely drained into the Brook, and wrote:

> The community problems that would be raised by general knowledge of such a waste stream and the concomitant poor publicity resulting certainly behoove us to take immediate action to control this condition.
>
> . . .
>
> We are and have been in violation of the law by not applying for an EPA Discharge Permit for this waste.

Id. Birch recommended an "aggressive" water conservation program be initiated at once, as well as several other remediative actions. Id. He instructed Davidson to submit another appropriations request to McCord Maine and asked to be informed when the appropriation cleared Dover (where Davidson

was headquartered).  That way, Birch said, he could ensure that the request did not "get hung up in Detroit."  Id.

The Company resumed discussions with EEI.  And, in a letter dated May 14, 1974, EEI proposed to update its July 1973 proposal, but offered to analyze other treatment options as well.  On May 15, 1974, Cochrane submitted an appropriations request to Veale, now requesting $11,000 for an engineering study of potential solutions to Farmington's "wastewater problems."  Pls.' Exh. 39.  That request states:

> [W[e are now overflowing into neighboring property, exposing the company to civil action, and adverse publicity in a New Hampshire election year.  The north discharge is not in violation of E.P.A. regulations at this time, since it currently is not being discharged into a stream . . . However, existence of this condition is known to many, . . . and could lead to serious politically oriented publicity not beneficial to the Davidson Rubber Company.
>
> This program has been reviewed with Dick Birch on two occasions this past year and has his endorsement.

Id.  Cochrane's appropriation request includes a brief history of Plant's wastewater issues:

> The Farmington plant is currently discharging waste water onto its own property north of the plant, with overflow onto neighboring property.  This waste includes PVA, foam grindings, paint grindings, [and] various waxes. . . . The north end discharge . . . represents an "attractive nuisance" since it neither is enclosed nor controlled in any way, and could result in extremely adverse community reactions.

19

. . .

> In the spring of 1973, it was discovered during
> routine inspection of the effluent water that serious
> pollution was occurring in the Pokamoonshine Brook
> (south) due to added water wash operations and the
> addition of Parks wax (an emulsified oil base
> material) as a mold release for crash pads. . . .  An
> appropriation was requested and approved in May 1973
> for the immediate temporary diversion of all sources
> of illegal waste water from the Pokamoonshine Brook.
> Such diversion resulted in increased flow to the north
> end discharge, which is now the source of our problem.

Id.

The appropriations request was approved, and EEI submitted a Preliminary Engineering Report to Davidson in July, 1974.  The report summarized and evaluated several different wastewater treatment options, concluding that installation of lagoons was the Plant's most cost-effective option.  Pls.' Exh. 43.  But, EEI's report noted, the lagoons might result in further groundwater contamination.  Cochrane and Veale discussed EEI's report.  Cochrane noted that a percolating lagoon seemed like the best option, and that "R. Birch is in general agreement [with the] report."  Def's. Exh. 45.

On August 14, 1974, Cochrane submitted another appropriations request to Veale, this time for $69,000 to cover the installation of a percolating lagoon system to treat the Plant's wastewater.  Pls.' Exh. 44.  The appropriation was

authorized by McCord Maine, and, on August 19, 1974, the New
Hampshire Water Supply and Pollution Control Commission approved
the system's construction.  Birch was copied on a memo to Veale
from Cochrane that noted the Commission's approval.  Pls.' Exh.
46.  The lagoon treatment system was constructed and operative
by 1975.

All parties agree that Davidson did not directly employ any
individual charged with responsibility for environmental
compliance or pollution management at the Plant until 1976.  In
1976, however, Howard Williams, a Davidson employee based out of
their facility in Dover, was promoted to Manager of Safety and
Environmental Affairs for the company.

In 1977, the Plant was expanded, which included
construction of a sewage waste disposal system.  The Plant
engaged EEI, Inc., to assist with design and permitting of the
new system.  Birch was looped in on EEI's efforts, and later
testified that he "review[ed] the drawings pertaining to the
waste disposal facilities," pls.' exh. 16 at 77:2-6, which had
been submitted to him for approval, pls.' exh. 48.  Beyond being
asked to approve the "plans [and] specs" for the new system,
id., Birch's role in the Plant's construction of the new septic
system is not entirely clear from the record.  But, the record
does establish that Birch had approval authority over

construction of the new sewage waste system, a system which eventually contributed to groundwater pollution at the Site.

**The Ex-Cell-O Years**

In 1978, McCord Maine was acquired by Ex-Cell-O and reorganized as McCord Michigan and Davidson Rubber. The reorganization brought with it certain changes. For example, in multiple communications with regulatory officials at the federal and state level following the reorganization, Davidson Rubber now represented itself as a "division of Ex-Cell-O," including in its Resource Conservation and Recovery Act (RCRA) permit applications.[4] And, several permits that were issued by state and federal agencies identified Davidson Rubber as a "division" of Ex-Cell-O, not a subsidiary.

Ex-Cell-O provided its "divisions," including Davidson, with administrative and consulting services, including legal, human relations, and tax accounting support. For example, Ex-Cell-O represented Davidson in a commercial breach of contract case involving a payment dispute. And, in 1983, Ex-Cell-O's in-house counsel Walter Vashak, along with Birch, and Howard

---

[4]    Defendant points out that, in applying for a RCRA storage permit, the Plant was acting against Birch's advice, since Birch had instructed that Ex-Cell-O's plants need not apply for a RCRA permit.

Williams, represented Davidson in a CERCLA liability action connected to the Silresim Superfund site, with Vashak negotiating Ex-Cell-O's settlement payment on the Plant's behalf. Ex-Cell-O handled Davidson's SEC reporting obligations, as well as its insurance coverage. Pursuant to those obligations, Vashak directed Davidson staff to keep him, and Birch, advised regarding any methylene chloride disposal issues, and wrote that it was "imperative" that he be informed regarding all of Davidson Rubber's contacts with state and federal authorities.

Birch now served as Ex-Cell-O's director of energy and environmental affairs. In that capacity, Birch implemented an "environmental audit" program to regularly inspect Ex-Cell-O facilities, including Farmington, and identify regulatory violations, and issue corrective actions. Birch described the audits:

> We make -- we submit a report in writing that – [of] -
> - things we found in the visit [that] are reviewed
> with the plant management, and a member of the
> corporate legal staff attends that.
>
> When we get back, we write a report to the division or
> plant, tell them what we found. We break our
> recommendations down into three groups; things that
> they better damn well fix like right now, things that
> are serious that they should pay attention to, and
> things that are wrong, but they will only get their
> wrists slapped for. These are primarily paperwork
> violations.

And then we send them a -- as I say, we send the plant
management a letter, and we ask for a reply from them
within six weeks giving us a schedule of what they are
going to do to correct the item[s].

Pls.'s Exh. 16 at 114:9-23.

Overall, however, Birch's involvement with the Plant's
water pollution issues was less extensive during the Ex-Cell-O
years. He was involved in December, 1981, after the New
Hampshire Bureau of Solid Waste Management issued a Regulatory
Order to "Howard Williams, Davidson Rubber Division, Ex-Cell-O
Corporation," identifying the Plant's improper disposal of
methylene chloride in steel-bottom drums, and other hazardous
waste concerns. Birch visited the Plant in April, 1982, to
"solve the problem of the drum accumulation." Pls.' Exh. 65 at
281:22-282:2. But, Birch's idea to remediate the problem did
not work, so Davidson made no changes. Later, in 1985, Birch
facilitated an appropriations request for $120,000 from Ex-Cell-
O for Davidson to pay for a waterline for residents whose wells
were contaminated by groundwater pollution from a nearby
landfill where the Plant had sent its waste for disposal.

Other Ex-Cell-O employees addressed pollution problems and
environmental compliance efforts at the Plant. For example, Ex-
Cell-O employee Terrence Filipiak conducted the environmental
audits described above, and regularly took samplings, and

conducted Plant inspections.  Following New Hampshire's December 1981 Regulatory Order, Filipiak identified multiple issues relating to discharges from the Plant, including "discharge of heat transfer oil and plastisol to the lagoon with a resulting oil slick and oil soaked lagoon soils;" "water/oil discharge from the air compressors onto surface soils on the north side of the plant;" and the "discharge of paint to the northeast plant storm drain by employees."  Pls.' Exh. 68.  Filipiak instructed that these discharges cease immediately, be cleaned up, and, in some circumstances, employees reprimanded.

The Plant continued to discharge contaminated water into the Site's lagoon system until 1985 when the lagoons were finally closed.  That closure was largely managed by Davidson's employees.

**<u>Fireman's Fund Litigation and Subsequent Events</u>**

By 1986, Ex-Cell-O, McCord, and Davidson Rubber were facing increasing environmental liability under federal environmental statutes.  They sought insurance coverage for various legal claims relating to the Plant, and other Ex-Cell-O properties.  Litigation ensued, and a several-day bench trial.  <u>Fireman's Fund Ins. Cos</u>., 750 F. Supp. at 1343-44.  As discussed earlier, Ex-Cell-O, Davidson Rubber and McCord argued that they were entitled to coverage because the extensive groundwater

contamination at the Plant was the result of "two sudden and accidental chemical spills" in 1977 and 1978.  The district court did not agree, finding that the contamination resulted from historic, regular operations at the Plant.  And, because the Plant's operators expected their intentional acts of waste disposal would result in environmental damage, they were not entitled to insurance coverage.

In 1987, Davidson Rubber was renamed Davidson Textron, Inc., and, in 1995 renamed again as "Textron Automotive Interiors, Inc."  In 2001, Collins and Aikman Products Company purchased Textron Automotive Interiors, Inc., renaming it "Collins and Aikman Automotive Interiors, Inc."  Collins and Aikman Corporation filed for bankruptcy on behalf of itself and its subsidiaries, including Collins and Aikman Automotive Interiors, Inc., in 2005.  At the time, the New Hampshire Custodial Trust (the Trust) took title to the Site.

Upon transfer of title to the Trust, plaintiffs investigated the extent of contamination at the Site.  In 2013, the Site was listed by the EPA on the National Priorities List. 78 Fed. Reg. 75,475, 75,478 (Dec. 12, 2013).  In December 2014, EPA began a Remedial Investigation of the Site in coordination with NHDES.  So far, the EPA has discovered VOCs in the groundwater originating from the Farmington Plant, and

identified relevant sources of contamination, including an area near the former percolating lagoons to the east, and the northwest septic leach field associated with the 1977 Farmington Plant expansion.

## DISCUSSION

CERCLA, which was enacted in 1981 "in response to the serious environmental and health risks posed by industrial pollution." U.S. v. Bestfoods, 524 U.S. 51, 55–56 (1998), "establishes a complex statutory scheme for responding to certain environmental hazards." Territory of Guam v. U.S., 141 S. Ct. 1608, 1611 (2021) (citations omitted). The Act was "designed to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." Burlington No. & Sante Fe Ry. Co. v. U.S., 556 U.S. 599, 602 (2009) (internal quotations omitted).

CERCLA "authorizes the EPA to undertake cleanup activities at designated hazardous sites and then sue to recover costs incurred from certain liable parties." United States v. Gen. Elec. Co., 670 F.3d 377, 382 (1st Cir. 2012) (citing 42 U.S.C. §§ 9604(a), 9607(a)) (further citations omitted). It "imposes strict liability for the costs of cleanup on a party found to be an owner or operator, past operator, transporter, or arranger."

27

U.S. v. General Electric. Co., 670 F.3d 377, 382 (1st Cir. 2012)

(quoting U.S. v. Davis, 261 F.3d 1, 29 (1st Cir. 2001)).

Because CERCLA "is a remedial statute designed to protect and

preserve public health and the environment," its provisions are

construed "liberally to avoid frustration of the beneficial

legislative purpose." United States v. Kayser-Roth Corp., 910

F.2d 24, 26 (1st Cir. 1990) (citations omitted).

For a successful CERCLA claim, plaintiffs must establish:

(1) a release or threatened release of hazardous waste has

occurred, (2) at a facility, (3) causing the EPA to incur

response costs, and (4) the defendant is a responsible party as

defined by 42 U.S.C. § 9607(a).[5]  See 42 U.S.C. § 9607(a)(1-4).

Responsible parties include the current owner or operator of a

facility, as well as the owner or operator of a facility at the

time it became contaminated.  42 U.S.C. 107(a).

The parties have stipulated to the majority of CERCLA's

requirements, i.e.: (1) defendant is a "person" under CERCLA and

New Hampshire law; (2) the Plant is a "facility" under CERCLA

---

[5]    Similarly, N.H. Rev. Stat. Ann. 147-B:10 "gives a person
who has incurred environmental response costs a right to
contribution against a facility's prior owners and operators."
EnergyNorth Nat. Gas, Inc. v. UGI Utilities, Inc., No. CIV. 00-
500-B, 2003 WL 1700494, at *2 (D.N.H. Mar. 28, 2003) (citation
omitted).

and New Hampshire law; (3) the Plant released hazardous
substances between 1966 and 1986; and (4) plaintiffs have
incurred costs not inconsistent with the National Contingency
Plan (NCP).  The parties have further stipulated that (5) McCord
is the successor to McCord Maine; and (6) McCord is the
successor to Ex-Cell-O Corporation.  The issue before the court
is whether McCord Maine and/or Ex-Cell-O Corporation "operated"
the Farmington Plant at the time the contamination occurred.

The Supreme Court has directly addressed whether a parent
corporation may "be held liable as operator of a polluting
facility owned and operated by the subsidiary," in United States
v. Bestfoods, 524 U.S. at 61-62.  The Court explained that a
corporate parent is not subject to liability under CERCLA simply
because its subsidiary owns or operates a polluting facility.
However, a parent may be directly liable under CERCLA "in its
own right" if that parent "actively participated in, and
exercised control over, the operations of the facility.  Id. at
55.  The Court wrote:

> Under the plain language of the statute, any person
> who operates a polluting facility is directly liable
> for the costs of cleaning up the pollution.  See 42
> U.S.C. § 9607(a)(2).  This is so regardless of whether
> that person is the facility's owner, the owner's
> parent corporation or business partner, or even a
> saboteur who sneaks into the facility at night to
> discharge its poisons out of malice.  If any such act
> of operating a corporate subsidiary's facility is done

29

> on behalf of a parent corporation, the existence of
> the parent-subsidiary relationship under state
> corporate law is simply irrelevant to the issue of
> direct liability.

Id. at 65.

> The Court defined an "operator" for CERCLA purposes as:

> someone who directs the workings of, manages, or
> conducts the affairs of a facility.  To sharpen the
> definition for purposes of CERCLA's concern with
> environmental contamination, an operator must manage,
> direct, or conduct operations specifically related to
> pollution, that is, operations having to do with the
> leakage or disposal of hazardous waste, or decisions
> about compliance with environmental regulations.

Bestfoods, 524 U.S. at 66–67 (emphasis added).  So, the Court

explained, the operative question "is not whether the parent

operates the subsidiary, but rather whether it operates the

facility, and that operation is evidenced by participation in

the activities of the facility, not the subsidiary."  Id. at 68.

    In the wake of the Bestfoods opinion, our court of appeals

decided United States v. Kayser-Roth Corp., 272 F.3d 89 (1st

Cir. 2001).  In Kayser-Roth, the government asserted that the

parent company defendant was liable for cleanup costs associated

with a Superfund site in Rhode Island as an "operator" under

CERCLA.  In applying Bestfoods, Kayser-Roth noted "an arguable

ambiguity" in the Bestfoods opinion, as the Supreme Court

seemingly links the "operational inquiry to the environmental

matters noted," but "[a]t other times, the Court articulates the
relevant parent-facility relationship more broadly, suggesting
an inquiry beyond the parent's direct involvement in pollution-
related activities at the plant." United States v. Kayser-Roth
Corp., 272 F.3d 89, 102 (1st Cir. 2001) (citing Bestfoods, 524
U.S. at 66–73). Noting the Supreme Court's attention to facts
specific to the parent company's involvement in the subsidiary's
environmental matters, our court of appeals resolved the
ambiguity, stating: "the pollution-related focus is
controlling." Kayser-Roth, 272 F.3d at 102. Thus, "direct
operator liability requires an ultimate finding of the parent's
involvement with 'operations having to do with the leakage or
disposal of hazardous waste, or decisions about compliance with
environmental regulations." Kayser-Roth, 272 F.3d at 102
(quoting Bestfoods, 524 U.S. at 66–67).

**(1)  Defendant's "Operation" of the Plant Through its Employees**

Defendant argues that it is entitled to judgment because
McCord Maine's and Ex-Cell-O's role with respect to the Plant
was "ordinary and unremarkable," and the activities performed
were "typical parent-subsidiary oversight." Def.'s Mem. in
Supp. of Summary Judgment at 31. McCord Maine and Ex-Cell-O
employees merely provided recommendations and advice, reviewed
and approved capital expenditures, implemented company-wide

policies, performed an occasional audit, and shared a
centralized legal department with its subsidiaries, according to
defendant.

Plaintiffs disagree, arguing that the record establishes
that McCord Maine and Ex-Cell-O "operated" the Plant through the
actions of their employees.  Plaintiffs focus primarily on
actions taken by Birch and Filipiak.

A.    Birch's Role at the Plant

The parties' portrayals of Birch's role with respect to the
Plant and its wastewater issues are quite disparate.  Defendant
says that Birch's involvement with the Farmington Plant was
"minimal," and "entirely within the typical boundaries of a
parent company conducting routine oversight" of a subsidiary.
Def.'s Mem. in Supp. of Summary Judgment, at 2.  Defendant
relies on Birch's testimony that he had no authority to direct
or control operations at McCord Maine or Ex-Cell-O facilities,
that he served only as a "resource" to the Plant, and that he
acted as a "consultant."  Id. at 35 (citing Def.'s Exh. 12, at
72:8-16).  Defendant argues that Birch's "suggestions and
recommendations to Davidson were part and parcel of good
parental oversight," id. at 37, and that management of the
Plant's environmental compliance fell squarely on Davidson
employees.

For their part, plaintiffs do not dispute that Davidson employees _also_ managed wastewater pollution at the Plant.  But, as they correctly point out, liability under CERCLA and New Hampshire law is joint and several.  See Atl. Richfield Co. v. Christian, 590 U.S. 1, 6-7 (2020) ("Responsible parties are jointly and severally liable for the full cost of the cleanup, but may seek contribution from other responsible parties.") (citing 42 U.S.C. § 9613(f )(1)).  Here, plaintiffs say, defendant is liable because Birch regularly managed and made decisions about pollution and environmental compliance at the Plant while acting solely in his capacity as an employee of McCord Maine and Ex-Cell-O.

The Supreme Court has instructed that "the verb 'to operate'" means, in this context, "more than mere mechanical activation of pumps and valves, and must be read to contemplate 'operation' as including the exercise of direction over the facility's activities."  Bestfoods, 524 U.S. at 71 (cleaned up). The record establishes that, while Birch may have viewed himself as a "consultant" to the Davidson Plant, in practice, Birch's role in the Plant's environmental compliance efforts and operations in the 1970s, and specifically those operations relating to the Plant's wastewater, was significant and, as a

practical matter, authoritative.[6]  For example, Hynes (who, according to defendant, was a "key player in managing the water pollution issues," def.'s opp. to pls.' mot. for summary judgment at 7) testified:

> Q.   As of April 17th, 1974, what was R.F. Birch's position with Davidson?
>
> A.   I believe he was environmental coordinator, some title like that, out of the Detroit office.

---

[6]    While Birch characterizes his role as a "consultant," other testimony he provided evidences the effective role he generally played with respect to environmental issues at defendant's subsidiaries.  For instance, when asked whether he was responsible "for subsidiaries of Ex-Cell-O Corporation personally," Birch responded:

> Ex-Cell-0 is a very decentralized company, and my relationship with a plant is determined in a large subsidiary such as Davidson Rubber with an environmental person like Howard Williams, my role is that of an overseer; In a small plant without environmental capability: my group or myself would get involved even to the level of design of equipment.

Def.'s Opp. Exh. 2 at 66-67.

    As noted supra, Davidson Rubber did not employ an "environmental person" until 1976.  So, while Williams may have taken the lead on the Plant's environmental compliance post-1976, prior to that point, Birch's testimony (and other evidence in the record) suggests that he was involved in managing environmental operations at the Plant ("even to the level of design of equipment."  Id.).

Q.   Was it your understanding that in that position
he had some responsibility for environmental matters
pertaining to the Farmington plant as well as others?

                        . . .

A.   I think so.

Q.   Was he the corporate environmental coordinator at
that time?

                        . . .

Q.   If you know.

A.   I think so.

Pls.' Exh. 97 at 123:18-124:9.  And, critically, Hynes

identified Birch as one of the mangers "primarily responsible"

for deciding to employ the lagoon water treatment system option.

See Pls.' Exh. 21 at 141:10-22 (emphasis added).[7]


    Birch often commented on environmental issues at the Plant,

generally, and the Plant's wastewater problems, specifically.

According to defendant, Birch was offering mere

"recommendations," not directives or orders, and consistently

used "language of advice and support rather than direction and

control."  Def.'s Mem. in Supp. of Mot. for Summary Judgment

---

[7]    Defendant objects to Hynes testimony as "speculative" and
"lacking foundation."  Def.'s Reply in Supp. of Mot. for Summary
Judgment at 6.  But, given defendant's position that Hynes was a
key player in managing environmental compliance at the Plant,
and the passage of time, Hynes's memory is certainly relevant
and probative.

at 36. And, defendant says, plant employees understood that advice as recommendations, they were free to independently evaluate and disregard, not mandates.

Birch's input was not always followed,[8] but, most of the time, the Plant did as Birch advised. For example, Birch's 1971 memo, relied upon by defendant, states that the five action items he proposes "should be done on a crash basis" to address the Plant's wastewater issues. Pls.' Exh. 23. As Birch instructed, the majority of those items were quickly implemented. Testimony in the record also reveals that Davidson employees did not view Birch's instructions as entirely optional. For example, Davidson employee Cochrane testified that, while he was "not quite sure what [Birch's] position was in '71," Birch frequently visited the Plant, and, after touring, "usually would leave with reports of what should be done and would either praise us or <u>tell us that we needed to do certain -- make corrections, whatever</u>." Pls.' Exh 95 at 73:3 – 74:10 (emphasis added).

---

[8]    For example, defendant points out that the Plant did not implement one of the five actions that Birch recommended in his November, 1971, memo. The Plant also initially rejected Birch's suggestion that an aerated lagoon be built to treat wastewater. A concrete chlorination system was developed instead (although, eventually, the lagoons were constructed).

Moreover, other testimony in the record shows that Birch himself did not view his "suggestions" as optional.  For example, in Birch's description of the Ex-Cell-O auditing process, he refers to the audit findings as "recommendations," but also testified that certain audit findings were categorized as "things that [the Plant] better damn well fix like right now," and that the Plant was required to provide a schedule within six weeks detailing exactly how identified problems would be corrected.  Pls.' Exh. 16 at 114:9-23.  So, as described by Birch, implementation of action items arising from Ex-Cell-O's audits was neither optional nor discretionary.

The record establishes that, while Davidson employees were, of course, also involved in management of the Plant's water pollution, Birch played a significant, influential, and effective role as well.  Indeed, the factual record establishes that Birch worked closely <u>with</u> Davidson employees on the Plant's wastewater pollution problem, and he did so authoritatively. Birch frequently visited the Plant (at least quarterly, <u>see</u> pls.' exh. 95 at 73:16-21), and was fully familiar with the Site, its manufacturing equipment, and its production processes (having overseen its construction as a Davidson employee).  He attended and participated in meetings to devise solutions to the Plant's wastewater pollution issues, and he was frequently

copied on memos and notes from EEE, Inc., proposing potential solutions.  In 1974, Birch directed Plant employees to prepare an appropriations request for a wastewater treatment facility at the Plant, and he promised that he would ensure that request "cleared Detroit."  He also directed Plant employees to implement short-term treatment steps in the meantime.  The appropriations request later submitted by the Plant noted Birch's endorsement.  Birch had approval authority over the design of the Plant's 1977 septic system expansion, a system which ultimately contributed to the contamination of the Site's groundwater.[9]  And, finally, as previously noted, Hynes testified that Birch was one of the individuals "primarily" responsible for selection of the lagoon water treatment system.  Birch was plainly an integral and authoritative member of a team making decisions about how to handle the Plant's pollution problems.

---

[9]     Defendant argues that any assistance Birch provided regarding the design of the septic system is irrelevant, and, in support, cites to Am. Premier Underwriters, Inc. v. Gen. Elec. Co., 14 F.4th 560, 579 (6th Cir. 2021), where the Court of Appeals for the Sixth Circuit stated: "design is insufficient by itself to generate liability; CERCLA liability attaches to operators, not designers."  Defendant's reliance is misplaced. EEI designed the septic system, not Birch, but Am. Premier is distinguishable.  There, GE served merely as a "service provider," performing a contractual duty, with "no say on matters related to waste disposal and environmental compliance." Id. at 581; see also id. ("nothing [plaintiff] points to shows that GE told Penn Central what to do with the [hazardous substance].").

His participation and his ability to influence decisions and
actions carried the full weight of the parent company – a
practical reality that was no doubt not misunderstood by
Davidson management and employees.

Birch was also directly involved in the Plant's
environmental compliance efforts, specifically those efforts
relating to its wastewater disposal practices.  Following the
Clean Water Act's passage, Birch addressed its requirements with
Plant employees.  Cochrane testified that, as a result, the
Plant "started programs of following [Birch's] recommendations
of monitoring and reducing and all those things that he had
recommended."  Pls.' Exh. 95 at 75:9-14.  Cochran also testified
that Birch personally reviewed the results of the Plant's
effluent monitoring:

> Q. In monitoring the makeup of the effluents, what was
> being looked for?
>
> A. I can't specifically recall.  I know that there
> [were] specific criteria that would be monitored, and
> the results were being reviewed by people such as
> [EEI's William] Fletcher and Birch and giving us
> advice as to what to be done.

Pls.' Exh. 95 at 76:21-77:1.  Compare Pls.' Exh. 97 at 93:5-20
(Hynes responding "no" when questioned whether he reviewed water
sample reports from time to time); id. at 96:11-17 and 98:13-19
(Hynes testifying that he did "not recall" receiving information

as to "whether or not maximum bacterial contamination levels" were found in water samples, and that he "would not know if it was or not").

Birch weighed in on other environmental issues at the Plant as well.  He was instrumental in bringing about the Plant's decision to segregate solid and liquid wastes for disposal.  See Pls.' Exh. 95 at 85:14-22.  ("Q: At some point, did you personally decide that it was necessary to segregate solid and liquid wastes for disposal?  [Cochrane:] I don't think I made that decision.  I think it was made as a decision of the group, a meeting with Dick Birch, et cetera.").  In 1975 or 1976, he investigated the "feasibility of the incineration of the Farmington plant waste," "seeking a person to manufacture an incinerator so that we could take care of Farmington wastes ourselves."  Pls.' Exh. 103 at 990:13-991:3.  Birch was copied on monthly monitoring reports sent to the EPA in 1974 and 1975, and at least one of the Plant's discharge permit applications (in 1972).  And, when asked who was responsible for "drafting permit applications under environmental statutes and regulations" for Davidson in 1974, Hynes responded: "Could be Dick Birch," pls.' exh. 97 at 120:19-24, which suggests that Birch was, at a minimum, involved in the Company's permitting efforts.  Finally, Birch visited the Plant to resolve the

pollution-related drum storage issue in 1982, and he worked to resolve the Plant's potential CERCLA liability arising out of waste disposal at the Silresim Superfund Site.

Given all the above, characterizing Birch's involvement as "casual" or "occasional" would understate the circumstances to the point of substantial distortion.  The record establishes Birch's active, sustained, detailed, authoritative and effective participation in the Plant's decisions regarding its wastewater disposal practices, and his involvement in the Plant's ongoing environmental compliance efforts.  Moreover, Birch's recommendation and approval of the lagoons as a wastewater treatment option (and, potentially, his approval of the 1977 septic system) undoubtedly contributed directly to the Plant's pollution of the Site's groundwater.

### B.    Other McCord Maine/Ex-Cell-O Employees

Other McCord Maine and Ex-Cell-O employees participated in the Plant's environmental compliance efforts and wastewater management.  But, none of their efforts (at least as reflected in the current record) were as extensive or authoritative as Birch's with respect to the Plant.  Vashak, for example, provided advice and legal assistance to the Plant with respect to environmental compliance and litigation.  However, the Plant's reliance on Ex-Cell-O's legal department is fairly

41

typical parent-subsidiary interaction and does not raise an
eyebrow.  See, e.g., Trinity Industries, Inc. v. Greenlease
Holding Company, 903 F.3d 333, 364 (3d Cir. 2018) (parent's
provision of "legal advice regarding compliance with
environmental laws" is "typical" of parent-subsidiary
relationship).

Filipiak's role, however, is more notable.  As discussed,
Filipiak, an Ex-Cell-O employee, oversaw environmental audits of
the Plant, and, in that capacity, visited regularly to conduct
sampling and inspections.  Following a visit to the Plant in
October, 1982, Filipiak identified several problematic
environmental practices at the Plant, and instructed that those
practices be stopped immediately.  He wrote:

> Other areas which require attention noticed during my
> visit include: The continued buildup of methylene
> chloride contaminated foam with no solution for
> disposal, material substitutions and/or provisions for
> secure storage.  This situation is subject to fine by
> the EPA because of the current poor storage practice
> used.
>
> The discharge of heat transfer oil and plastisol to
> the lagoon with a resulting oil slick and oil soaked
> lagoon soils must be stopped immediately, with cleanup
> of soils and surface waters or face a citation from
> local environmental agencies.  Disposal of this
> material must be made through a waste processor or
> hazardous waste facility.
>
> The water/oil discharge from the air compressors onto
> surface soils on the north side of the plant is a
> violation of EPA 40CFR112 and is subject to citation.

> An oil separation tank should be placed to collect all
> discharges, with the periodic draining of the floating
> oils to a waste oil holding area for reclaim.
>
> The discharge of paint to the northeast plant storm
> drain by employees <u>must be halted immediately, with
> the reprimand of those responsible employees</u>.  The
> State of New Hampshire forbids the discharge of any
> foreign materials into a storm water system other than
> storm water, the impact on area waters could be
> devastating (fish kill, stream discoloration, etc.).

Pls.' Exh. 68 (emphases added).

Filipiak's October, 1982, memo is noteworthy because it
discloses an Ex-Cell-O employee directing the Plant to take
specific action with respect to the Plant's wastewater disposal
practices.  Defendant argues that Filipiak had "no authority" to
direct Plant employees to take action.  See Def.'s Opp. to Pls.'
Mot. for Summary Judgment at 37.  While that may be correct as a
matter of corporate law, as a practical matter, Filipiak would
only bother visiting the Plant, inspecting the Plant, and then
firmly instructing Plant employees that certain action must be
taken, only if he carried the authority of, and directive intent
of the parent company.  Howard Greenlaw, Farmington's utilities
group leader, later testified that the Plant did comply with at
least some of Filipiak's instructions.  See Def.'s Opp. Exh. 31
at 208:12-23 ("We implemented his recommendation, it refers to
here, the oil separation tank.").  Filipiak's role, then, like
Birch's, establishes that McCord Maine and Ex-Cell-O

43

substantially and effectually participated in managing the environmental issues and pollution contamination at the Plant.


C.    Frequency of Employee Involvement

Defendant contends that it is entitled to summary judgment because, whatever involvement its employees may have had with the Plant, that involvement was "too sporadic" to establish CERCLA operator liability.  Def.'s Reply in Supp. of Summary Judgment at 9.  Defendant argues that, for CERCLA liability to attach, an operator must make decisions on a frequent, day-to-day basis.[10]

---

[10]    In support, defendant relies largely on City of Wichita v. Trs. of APCO Oil Corp. Liquidating Trust, 306 F. Supp. 2d 1040, 1055 (D. Kan. 2003).  City of Wichita is distinguishable because the court was examining whether a company's officers and directors could be considered "operators" for purposes of CERCLA.  Similarly, in City of N.Y. v. N.Y. Cross Harbor R.R. Terminal Corp., No. 98CV7227ARRRML, 2006 WL 140555 (E.D.N.Y. Jan. 17, 2006), another case upon which defendant relies, plaintiff sought to hold the defendant's owner/corporate officer liable as an operator under CERCLA.

In that context, the court in Wichita wrote: "courts applying the actual control test have consistently required more than casual or occasional involvement in such decisions. Instead, an operator under CERCLA must make the relevant decisions on a frequent, typically day-to-day, basis." (emphasis added) (citations omitted).  A strict frequency requirement makes sense when assessing an individual's personal liability. But, that is not this case.

In addition, defendant does not explain the "actual control" test cited by the court in Wichita, or whether it applies here.  And finally, nearly every one of the cases cited

To be sure, Birch and Filipiak were not participating in or influencing decisions about environmental compliance for the Plant on a daily basis.  But, defendant's argument that <u>day-to-day</u> activity is required to support a finding of CERCLA operator liability contradicts <u>Bestfoods</u> and subsequent precedent in this Circuit.  In <u>United States v. Kayser-Roth Corp.,</u> 103 F. Supp. 2d 74, 82 (D.R.I. 2000), <u>aff'd sub nom.</u>  <u>United States v. Kayser-Roth Corp.,</u> 272 F.3d 89, the district court noted that <u>Bestfoods</u> "makes clear that the imposition of operator liability does not require a finding that the parent directly participated in the day-to-day activities at the hazardous waste facility.  <u>Bestfoods</u> recognizes that operator liability may be imposed when the parent controls the manner in which a subsidiary manages the facility."

What's more, by focusing on the frequency of the parent company's involvement, defendant misses the forest for the trees.  Because "[o]perator liability requires an ultimate finding of involvement with operations having to do with the leakage or disposal of hazardous waste," <u>Am. Cyanamid Co. v.</u>

---

by the <u>Wichita</u> court in support of the statement upon which defendant relies predates <u>Bestfoods</u>.

For all those reasons, defendant's reliance is misplaced.

Capuano, 381 F.3d 6, 23 (1st Cir. 2004) (cleaned up) (internal quotations omitted), the focus of the operator inquiry is broad. The frequency of the parent's involvement is relevant, to be sure, but the "degree and detail" of the parent company's involvement matters much more.  Bestfoods, 524 U.S. at 72. Imagine that a parent company directs its subsidiary to dump all hazardous waste directly into a lake abutting their property, and the subsidiary complies with that directive  The parent company could hardly avoid CERCLA "operator" liability by arguing that it was only involved on one solitary occasion.

    In any event, with respect to Plant operations involving hazardous waste and environmental compliance, Birch's involvement can be fairly characterized as "regular" and "ongoing," influential, directive, and authoritative.  City of N.Y. v. N.Y. Cross Harbor R.R. Terminal Corp., 2006 WL 140555, at *13, especially given Birch's consistent involvement with the Plant's activity related to its effluent disposal practices in the early 1970s.  For that reason as well, defendant's argument is not persuasive.

(2)  **Treatment as an Internal Division: Relationship Between Davidson & McCord Maine/Ex-Cell-O**

Plaintiffs offer an alternative theory of liability: Because defendant treated Davidson as an internal division and disregarded corporate formalities, the court should treat Davidson as an internal division and hold defendant directly liable on that basis.  In support of that argument, plaintiffs contend that defendant held Davidson out as its division to the public and regulators.  Ex-Cell-O, specifically, plaintiffs say, failed to observe corporate norms when it identified itself as the owner and operator of the Plant in permit applications submitted to government agencies, and by repeatedly describing Davidson Rubber as its "division," instead of its subsidiary, in annual reports, Board of Director materials, and company correspondence.

Plaintiffs draw further support from Ex-Cell-O's appropriation request procedures, which required Ex-Cell-O approval for seemingly modest expenditures, and that Davidson Rubber employees, including a Rule 30(b)(6) witness chosen by defendant to testify on its behalf, testified that they thought Davidson was a division of Ex-Cell-O, not a subsidiary. Finally, plaintiffs point out that defendant has failed to produce any documents that evidence meetings of the Davidson Board of Directors, which, they say, "demonstrates a failure to

meet and maintain records, and the failure to respect Davidson

Rubber's independent existence."  Pls.' Mem. in Supp. of Mot.

for Summary Judgment at 40.


Plaintiffs offer little authoritative support for their

position, and applicable law is to the contrary.  Our court of

appeals has expressly noted that "the pollution-related focus is

controlling," and "direct operator liability requires an

ultimate finding of the parent's involvement with 'operations

having to do with the leakage or disposal of hazardous waste, or

decisions about compliance with environmental regulations."

Kayser-Roth, 272 F.3d at 102.  And, as noted by the court in

Yankee Gas Servs. Co. v. UGI Utilities, Inc.:


> In resolving whether a parent corporation manages,
> directs, and conducts the operations of a facility
> that relate to pollution, courts should focus on the
> parent's interaction with the subsidiary's facility,
> and not on the relationship between the two
> corporations.  As the Supreme Court put it, "[t]he
> question is not whether the parent operates the
> subsidiary, but rather whether it operates the
> facility, and that operation is evidenced by
> participation in the activities of the facility, not
> the subsidiary."  Bestfoods, 524 U.S. at 68.
>
> [ . . . ]
>
> Thus, control of the subsidiary, if it is extensive
> enough, may give rise to indirect liability via
> piercing of the corporate veil, but it does not give
> rise to direct liability as an operator under CERCLA.

616 F. Supp. 2d 228, 241 (D. Conn. 2009) (emphasis added).  See also PPG Indus. Inc. v. United States, 957 F.3d 395, 403 (3d Cir. 2020) ("operator liability requires something more than general control over an industry or facility — it requires some indicia of control over the facility's polluting activities."); Frontier Commc'ns Corp. v. Barrett Paving Materials, Inc., No. CIV.07-113-B-S, 2009 WL 2711959, at *5 (D. Me. Aug. 14, 2009), report and recommendation adopted, No. CIV.07-113-B-S, 2009 WL 3062360 (D. Me. Sept. 22, 2009) ("Evidence that is salient to this analysis is evidence that depicts the relationship between the parent and the facility itself, rather than the parent-subsidiary relationship.").

Nevertheless, some courts have taken the relationship between a parent and its subsidiary into account when determining "whether a parent corporation should incur direct operator liability at a facility."  United States v. Sterling Centrecorp Inc., 960 F. Supp. 2d 1025, 1049 (E.D. Cal. 2013), aff'd, 977 F.3d 750 (9th Cir. 2020) (collecting cases).  Those courts have reasoned that, while "such evidence cannot be determinative of the issue of direct operator or arranger liability, evidence of the corporate relationship between [parent company] and [its subsidiary] is relevant to provide important factual background in this matter."  Pinal Creek Grp.

49

v. Newmont Mining Corp., 352 F. Supp. 2d 1037, 1041 (D. Ariz.

2005).  The district court's summation of the issue in Yankee

Gas Servs. Co. v. UGI Utilities, Inc., is apt:

> Plaintiffs contend that inquiry into the general
> relationship between [the parent] and its subsidiaries
> remains important, despite statements in Bestfoods to
> the contrary.  The Court is skeptical of Plaintiffs'
> claims, since Bestfoods emphatically directs lower
> courts' attention to the relationship between the
> parent corporation and the subsidiary's facility, not
> the relationship between the parent and the subsidiary
> itself. . . .  Nevertheless, since the Supreme Court
> also indicated that eccentricity or adherence to
> ordinary corporate norms remains a touchstone of the
> Bestfoods operator inquiry, the Court begins its
> discussion with an examination of the overall
> relationship between [parent] and [its subsidiary].

616 F. Supp. 2d 228, 245 (D. Conn. 2009).

The court shares the skepticism expressed in Yankee Gas

Servs.  But, considering evidence relating to the overall

relationship between Davidson and McCord Maine/Ex-Cell-O for the

limited purpose of providing factual background and context does

not divert the proper legal analysis away from McCord Maine's

and Ex-Cell-O's relationship with the Plant's hazardous waste

disposal actions and environmental compliance efforts.

## (3) **Eccentricity and Corporate Norms**

The critical question remains: Whether McCord Maine and Ex-

Cell-O's involvement with the Plant's wastewater pollution

constitutes managing, directing, or conducting "operations

specifically related to pollution, that is, operations having to
do with the leakage or disposal of hazardous waste, or decisions
about compliance with environmental regulations." Bestfoods,
524 U.S. at 66-67.  In that regard, the Supreme Court instructs
that the proper inquiry is "whether, in degree and detail,
actions directed to the facility by the agent of the parent
alone are eccentric under accepted norms of parental oversight
of a subsidiary's facility." Bestfoods, 524 U.S. at 72.

Plaintiffs rely heavily on Kayser-Roth,[11] discussed supra,
in which our court of appeals found the parent company liable as

---

[11]   Plaintiffs also rely on the report of their expert, Dan
Leistra-Jones, who examines the role that Birch played at the
Plant during the McCord Maine years.  Leistra-Jones concludes
that Birch "provided environmental management services,
including waste disposal and environmental compliance, for
Davidson Rubber, even though he was an employee of McCord ME."
Pls.' Exh. 5 at p. 27.  He notes that, because Birch was an
employee of McCord Maine at that time, not Davidson, and because
Birch's involvement with the Plant's environmental management
and regulatory compliance services was so extensive, McCord's
and Davidson's failure to formally document Birch's involvement
is troubling.  Leistra-Jones opines that Birch's "level of
involvement . . . particularly in the absence of a secondment or
management services agreement, indicates a failure of Davidson
Rubber and McCord ME to follow corporate norms with respect to
maintaining separate corporate identities." Pls.' Exh. 5 at
p. 20.

In rebuttal, defendant relies on its own expert, Dr. Edward
Zajac.  Dr. Zajac opines that Birch's role with respect to the
Plant's "water pollution issues and with other environmental and
construction matters at Farmington in the 1970s and 1980s was
consistent with normal corporate practice." Def.'s Opp. Exh.
14.  But defendant also makes the argument "that expert

an operator based on: (1) the parents' knowledge of the

subsidiaries' manufacturing process involving hazardous

substances; (2) the parents' approval of that manufacturing

process, based on cost studies that had been mandated by the

parent; (3) the parents' legal departments' request to be

notified of government contact regarding environmental matters;

and (4) the parents' settlement decisions made on behalf of the

subsidiary in an earlier environmental matter.

Our appellate court's analysis focused largely on the

activities of Kayser-Roth's executive vice president, who,

wearing "no hat . . . but the parent's," exerted operational

control over environmental matters at the subsidiary's facility.

Id. at 103 (further quotations omitted).  Those activities

included directing that cost studies be conducted to evaluate

various solutions to a wastewater discharge issue; rejecting

---

testimony is not necessary for the Court to evaluate and rule on
the basic principles of corporate governance at issue in this
case," and that, to the extent such testimony is necessary, the
case cannot be resolved on summary judgment.  Def.'s Opp. to
Pls.' Mot. for Summary Judgment at 17.

The court agrees with defendant on both points.  "Competing
expert opinions present the 'classic battle of the experts' and
it is up to a jury to evaluate what weight and credibility each
expert opinion deserves."  Phillips v. Cohen, 400 F.3d 388, 399
(6th Cir. 2005) (cleaned up).  And, expert testimony, while
perhaps helpful, is not necessary to resolve the issues in this
case.

certain treatment options and approving others based on his assessment; and playing a "critical leadership role" in settlement of a separate EPA action.  The court concluded that Kayser-Roth's executive had "played a central role in decisions about environmental compliance . . . and specifically the decision to implement that cleaning process," going "far beyond the norms of parental oversight, reflecting instead direct control by the parent at the . . . facility over operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations."  Id. at 104 (internal citations omitted).

Plaintiffs' reliance on Kayser-Roth is well-taken, given its similarities to the facts here.  In both cases, a parent company employee (who was not also an employee of the subsidiary) played a significant role in the environmental operations of its subsidiary.  Birch, like the executive in Kayser-Roth, played a central role in the Plant's decision to install the lagoon wastewater treatment system, from which hazardous wastes leached into the Site's groundwater.  And, like the executive in Kayser-Roth, Birch played a critical role in driving decisions about environmental compliance at the Plant.

For its part, defendant relies on Trinity Industries, Inc. v. Greenlease Holding Company, 903 F.3d at 364.  In that case,

the parent company employed "only a professional staff, such as
accountants, actuaries, and lawyers," who assisted the
subsidiary with administrative work.  Id. at 364.  The Court of
Appeals for the Third Circuit noted that the parent "did not
employ any engineers or persons with technical experience in
manufacturing that could make decisions for [the subsidiary]
with respect to environmental compliance or waste management."
Id. at 343.  Accordingly, it was the subsidiary's employees, not
the parent's, who coordinated disposal with outside contractors
and communicated with regulators on environmental matters.  But
here, Birch's technical background in environmental compliance
was significant.  And, as discussed repeatedly, his efforts with
respect to the Plant went far beyond providing administrative
assistance, offering legal advice, and monitoring the activities
of the Plant.

The relevant case law is not easily applied in cases like
this.  "Because determining operator liability depends so
heavily on the facts of each case, it is difficult to draw
concise analogies between this case and other CERCLA operator
cases."  Union Pac. R.R. Co. v. Oglebay Norton Mins., Inc., No.
EP-17-CV-47-PRM, 2018 WL 1722175, at *7 (W.D. Tex. Apr. 9,
2018).  Bestfoods "remains the clearest guiding doctrine in
resolving this dispute."  Id.  As set forth at length herein,

even when viewed in the light most favorable to the defendant, the record simply does not support a finding that Birch's involvement with the Plant was "within the typical boundaries of a parent company conducting routine oversight of a subsidiary's operations."  Def.'s Mem. in Supp. of Summary Judgment, at 2. Instead, with "no hat to wear but the parent's hat," Bestfoods, 524 U.S. at 71, Birch worked closely with Davidson's employees, in an influential and authoritative manner, over a period of several years, to address the Plant's hazardous wastewater issues.  Birch's activities in that regard cannot plausibly be characterized as the occasional provision of general advice on environmental matters.  Bestfoods instructs that where an individual is employed solely by the parent company, and not the subsidiary, that employee's actions "were of necessity taken only on behalf of" the parent company.  Bestfoods, 524 U.S. at, 72.

The court finds that McCord Maine's and Ex-Cell-O's roles with respect to management of hazardous waste matters at the Plant and decisions about environmental compliance went well beyond activities consistent with a parent's ownership status, "such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and

articulation of general policies and procedures." Defendant's motion for summary judgment is therefore denied.

As in many cases, the issues here turn on the realities presented in the record. Plaintiffs have established McCord Maine's and Ex-Cell-O's "involvement with operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." Kayser-Roth Corp., 272 F.3d at 102. The material facts are not genuinely disputed, and plaintiffs are entitled to judgment as a matter of law. Accordingly, plaintiffs' motion for partial summary judgment is granted.

**CONCLUSION**

For the foregoing reasons, as well as those set forth in plaintiffs' memoranda (documents no. 38-1, 46-1, and 50), plaintiffs' Joint Motion for Partial Summary Judgment (document no. 38) is **GRANTED**, and defendant's Motion for Summary Judgment on Liability (document no. 39) is **DENIED**.

    **SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

March 28, 2025

cc:  Counsel of Record